SAXON COFFEE SHOP, INC. *vs.* BOSTON LICENSING BOARD.

Suffolk. February 6, 1980. — June 23, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Boston Licensing Board. Practice, Civil,* Extraordinary review. *Quasi Judicial Tribunal. Due Process of Law,* Vagueness of statute. *Regulation. Common Victualler. Words,* "Substantial evidence."

The standard of review in cases where a local licensing board has revoked a common victualler's license under G. L. c. 140, § 9, is the substantial evidence test. [922-925]

The provision of G. L. c. 140, § 9, which permits the revocation of a common victualler's license if the licensee conducts his business "in an improper manner" was unconstitutionally vague as applied to a licensee whose license was revoked on the ground that he permitted his premises to be used by prostitutes. [925-929]

The provision of G. L. c. 140, § 9, which permits the revocation of a common victualler's license if the licensee conducts his business "in an improper manner" was construed to mean improper acts related to the operation of the licensed establishment. [929-930]

In a proceeding before a local licensing board to revoke a common victualler's license pursuant to G. L. c. 140, § 9, there was insufficient evidence to support findings that the licensee had permitted the premises to be used for prostitution or for solicitation by prostitutes. [930-931]

CIVIL ACTION commenced in the Superior Court Department on December 26, 1978.

The case was heard by *Dimond,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Francis J. DiMento* for the plaintiff.

*John L. Keefe,* Assistant Corporation Counsel, for the defendant.

QUIRICO, J. This is an appeal from a judgment of the Superior Court affirming a decision of the Boston Licensing

Board (board) to revoke the common victualler's license of the appellant, pursuant to G. L. c. 140, § 9, as amended by St. 1975, c. 256, § 2. The appellant sought review in the Superior Court under G. L. c. 249, § 4. Jurisdiction of this court is based on G. L. c. 211A, § 10. We annul the decision of the board as unsupported by substantial evidence.

The Saxon Coffee Shop is located at 224A Tremont Street in Boston, in the "theatre district," and it is also in, or on the fringes of, the "combat zone." The coffee shop occupies the first floor of a five-story building, which contains fifteen apartments on the upper floor. One Andreou owns the entire building. He is also the principal stockholder of the coffee shop, and manages the shop during the day.

In August, 1978, the Boston police department began an investigation of prostitution in the area. As a result of their investigation, they filed two reports which were referred to the board. The reports asserted that known female prostitutes congregated both inside the shop and on the street in front of the shop, and signaled to or talked to passing males. When policemen arrived, the women would run inside the coffee shop and "stay there with the apparent cooperation of the management until the Police Unit [left] the area." The police reports further alleged that Andreou refused to "cooperate" when warned of possible criminal action.

On November 16, 1978, the board held a hearing. Two police officers involved in the investigation testified substantially to what was in their reports, with certain exceptions as discussed below. In addition, they testified that the apartments over the coffee shop were being used for prostitution. This conclusion was allegedly based on conversation with some "known prostitutes," and a conversation with another unnamed policeman who purportedly had seen some of these apartments furnished with only a mattress on the floor. Both police officers testified that "legitimate" women were being harassed by men in the area, and they considered the situation a "public safety factor." The officers said that Andreou had refused to cooperate by asking the women in question to leave his shop. One officer testi-

fied that other establishments in the area were not present-
ing similar "problems."

Andreou, who appeared at the hearing without an attor-
ney, testified that he was aware that there were prostitutes in
the area, but that this was "the polices' fault." He did not
believe he had the right to ask anyone to leave his shop, and
that even when he had to expel a "drunk" he had to call the
police. He said he screened the people who rented his apart-
ments, and checked to be certain they were employed, but
that these tenants had given their keys to prostitutes. To com-
bat this problem, he had evicted some people and hired a
live-in manager to keep out people "who don't belong there."

On December 14, 1978, the board issued its decision re-
voking Andreou's license and stating its reasons therefor.
The reasons were:

"1. The management, one Alexander Andreau [sic] as
owner and Peter Dardonis, as night manager, has allowed
the premises to be used for prostitution.

"2. Alexander Andreau [sic] owns the entire building at
224a Tremont Street which consists of the Saxon Coffee Shop,
Inc. on the first floor and apartments on remaining floors.

"3. A pattern existed whereby apartments in the building
were used to consumate [sic] the solicitation made in the
coffee shop[.]

"4. The licensee failed to cooperate with the police in in-
vestigating prostitution on the premises.

"5. The licensee expressed to the Board at the hearing
that in his opinion it is not his responsibility to ascertain the
occupation or activities of his patrons.

"6. The licensee, as the owner of the building in which
these prostitutes operate is receiving a financial gain and ap-
pears to have no interest in ending this enterprise. Some of
the apartments are furnished with only a mattress in the
middle of the floor.

"7. Other licensed premises on the same street within a
block or two have had no problems with use of the premises
by prostitutes. The problem here is due to the attitude of
management."

On December 26, 1978, the coffee shop sought review in the Superior Court. It sought a preliminary injunction against enforcement of the board's decision, which injunction was granted. The case was tried before a judge, who entered judgment on February 21 dismissing the complaint with costs.[1] After a hearing on February 23, the preliminary injunction was reinstated pending appeal. The coffee shop appealed to the Appeals Court, and we transferred the case to this court on our own motion.

The statute under which the board revoked the shop's license reads as follows: "If, in the opinion of the licensing authorities, a licensee as an innholder or a common victualler ceases to be engaged in the business he is licensed to pursue, or fails to maintain upon his premises the implements and facilities required by this chapter, they shall immediately revoke his license. If a licensee at any time conducts his licensed business in an improper manner, the licensing authorities, after notice to the licensee and reasonable opportunity for a hearing, may upon satisfactory proof thereof suspend or revoke his license. An innholder who violates section seven shall forfeit his license. A licensee who is convicted a second time of the violation of any of the provisions of sections six to eighteen, inclusive, shall forfeit his license." G. L. c. 140, § 9, as amended by St. 1975, c. 256, § 2.

1. *Standard of review.* General Laws c. 140, § 9, does not provide for either further administrative review or judicial review of the decision of the board.[2] The board is not a

---

[1] The Superior Court judge relied on the transcript, the notice to Saxon, and the two police reports to conclude that "the Board's findings sufficiently support the conclusion that Saxon has conducted its business 'in an improper manner' . . . . Although the Board made no express finding to this effect, it is clear from its other findings that the Board necessarily made this finding as well." He further found that "there was no evidence of solicitations or acts of prostitution actually committed in the coffee shop [but] there was substantial evidence that the shop, with the knowledge and consent of Andreou, was used by prostitutes as a roost and lookout for street solicitations and as a ready refuge from the police."

[2] Compare G. L. c. 140, § 9, with G. L. c. 138, §§ 64, 67 (liquor licenses; further administrative review).

State "agency" within the meaning of the State Administrative Procedure Act, G. L. c. 30A, § 1 (2). *United Food Corp.* v. *Alcoholic Beverages Control Comm'n,* 375 Mass. 238, 242 (1978),[3] and cases cited. Saxon therefore brought this action in the Superior Court under G. L. c. 249, § 4, a civil action in the nature of certiorari. This is the appropriate channel for review in this case, where a proceeding of an adjudicatory nature resulted in injury in the form of a lost license, and there is no other "reasonably adequate" remedy. See *Boston Edison Co.* v. *Selectmen of Concord,* 355 Mass. 79, 82-83 (1968); *School Comm. of Salem* v. *Civil Serv. Comm'n,* 348 Mass. 696, 697-698 (1965); *Connolly* v. *Alcoholic Beverages Control Comm'n,* 334 Mass. 613 (1956); *Miami Grove, Inc.* v. *Licensing Bd. of Boston,* 312 Mass. 318, 319 (1942); *Coyne* v. *Alcoholic Beverages Control Comm'n,* 312 Mass. 224 (1942).

We said in *McSweeney* v. *Town Manager of Lexington,* 379 Mass. 794, 800 (1980), that the appropriate standard of review in a certiorari case must be determined according to "'the nature of the action sought to be reviewed.'" See *Bos-*

---

[3] Most local licensing authorities are appointed by the mayor subject to confirmation by the board of aldermen or city council. See G. L. c. 138, §§ 1, 4. Under G. L. c. 138, § 10, certain cities, among them those with "a licensing board or commission created by special statute," are exempt from G. L. c. 138, §§ 1, 4. The Boston Licensing Board was created by special statute. St. 1906, c. 291, §§ 1-6. The Governor appoints members of the board. *Id.,* § 1. In our *Opinion of the Justices,* 374 Mass. 864, 866 (1978), we concluded the board is part of the "executive department" of the Commonwealth. See *McDonald* v. *Superior Court,* 299 Mass. 321, 324 (1938).

We have held on three occasions that the board "is not [a State] 'agency' within the meaning of the [State Administrative Procedure] act . . . ." *United Food Corp.* v. *Alcoholic Beverages Control Comm'n,* 375 Mass. 238, 242 (1978). *Boston Licensing Bd.* v. *Alcoholic Beverages Control Comm'n,* 367 Mass. 788, 796 (1975). *Dixie's Bar, Inc.* v. *Boston Licensing Bd.,* 357 Mass. 699, 702 (1970). In *United Food Corp., supra,* we said that "[t]hese holdings are in no way disturbed by the *Opinion of the Justices, supra.* In *Dixie's Bar,* indeed, we assumed that the [board] members were 'State officers' (357 Mass. at 702) but thought the [board] nevertheless would not qualify as a Statewide agency of the APA type because its operations were confined to the municipality." *United Food Corp., supra* at 242.

*ton Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 46 (1977); *Sherman* v. *Rent Control Bd. of Brookline,* 367 Mass. 1, 7-10 (1975). We declined to apply the substantial evidence test in *McSweeney,* and instead applied the "arbitrary, capricious or an abuse of discretion" standard for termination of employment. That standard of removal "for cause" had been defined by this court to be whether "there has been an arbitrary exercise of power, and the cause alleged for the removal is unreasonable and in law insufficient." *Dunn* v. *Mayor of Taunton,* 200 Mass. 252, 258 (1908).

The standard for revocation of common victuallers' licenses by local licensing boards is less clear. In *Miami Grove, supra,* decided prior to the enlargement of the scope of review in certiorari cases to include review of the evidence, we did not consider whether the evidence supported the board's findings. See *id.* at 324. In *Dixie's Bar, Inc.* v. *Boston Licensing Bd.,* 357 Mass. 699, 703 (1970), we inquired whether the board had committed an error of law, had abused its discretion, or had taken arbitrary or capricious action.

The standard of review in liquor license revocation cases, initiated under G. L. c. 138, § 23, but appealed from the Alcoholic Beverages Control Commission, is the substantial evidence test. *Olde Towne Liquor Store, Inc.* v. *Alcoholic Beverages Control Comm'n,* 372 Mass. 152, 153 (1977). While it is true that this test is mandated by the State Administrative Procedure Act, G. L. c. 30A, § 14 (7) (*e*), applied to the ABCC because it is a State agency, we see no difference in the "nature of the claim" in a liquor license revocation appeal and an appeal from revocation of a common victualler's license. Revocation proceedings in both instances are required by statute, and are adjudicatory in nature. The legal rights and duties of licensees are determined therein. See G. L. c. 138, § 67; G. L. c. 140, § 9. The "nature of the claim" is virtually identical on appeal. Therefore, we believe the proper standard of review in cases where a local licensing board has revoked a common victual-

ler's license under G. L. c. 140, § 9, is the substantial evidence test. See *Boston Edison Co.* v. *Boston Redevelopment Auth., supra; School Comm. of Salem, supra* at 698. Cf. *Young* v. *Mayor of Brockton,* 346 Mass. 123, 125 (1963) (licensing boards may be municipal for some purposes; but there is need for uniformity in the administration of a Statewide statute).

2. *Standard for revocation.* In order to apply the "substantial evidence" test to the present case, the board had to know of what fact or facts it was seeking evidence. Therefore, before discussing whether there was substantial evidence to support the decision of the board, we proceed to analyze the statutory standard under which revocation was ordered.

The relevant phrase from G. L. c. 140, § 9, is "[i]f a licensee at any time conducts his licensed business in an improper manner . . . ." Saxon has challenged the phrase "improper manner" as "unconstitutionally vague" in that it fails to provide sufficient notice of what conduct is proscribed, and because the phrase has not yet been construed by a judicial opinion.

Section 9 is not on its face a criminal statute, and therefore ordinarily would be judged by a lower standard than that applied to a criminal statute. See *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Comm'n (No. 1),* 374 Mass. 547, 553, dismissed for want of a substantial Federal question, 439 U.S. 803 (1978). The gravamen of the charge here, however, is that Saxon through its management allowed prostitutes to solicit and to seek refuge from the police on its premises.[4] Such acts could be subject to criminal prosecution. See G. L. c. 272, § 26; G. L. c. 139, §§ 4-13. Therefore we shall apply the criminal standard. See generally *Grocery Mfrs. of America* v. *Department of Pub. Health,* 379 Mass. 70, 83-84 (1979).

---

[4] Solicitation is "prostitution" for the purposes of G. L. c. 272, § 53. *Commonwealth* v. *United Food Corp.,* 374 Mass. 765, 770 (1978). See *Commonwealth* v. *King,* 374 Mass. 5, 13 (1977).

One strand of the vagueness doctrine is that a vague law may impermissibly delegate "basic policy matters" to individuals or groups, without "explicit standards for those who apply them." *Grayned* v. *Rockford*, 408 U.S. 104, 108-109 (1972). The question is whether Saxon "had sufficient warning, and the enforcement authorities had sufficient guidance," from § 9 or regulations construing it, to determine whether the conduct of Saxon's management provided grounds for revocation of a common victualler's license. *Aristocratic Restaurant (No. 1), supra* at 552.

The regulations of the board are not published in the Code of Massachusetts Regulations, and thus we are not permitted to take notice of them. See G. L. c. 30A, § 6; *Purity Supreme, Inc.* v. *Attorney Gen., ante* 762, 772 & n.12 (1980), and cases cited. Neither party has incorporated into the record or called our attention to any regulation which might mitigate the vagueness of the phrase "improper manner."

Neither this court nor the Appeals Court has had the occasion to construe the phrase. In the one case where we affirmed the revocation by the board of a common victualler's license, *Miami Grove, supra*, the licensee was charged with "violations of the drug law by sales on the . . . [premises involved] of Marihuana cigarettes . . ." and specific sales and approximate dates were given. *Id.* at 319-320. Furthermore, the licensee "had been warned officially on previous occasions of misconduct on and lack of supervision on the premises . . . ." *Id.* at 322. We held that the occurrences found by the board to have taken place, and the fact that warnings had been issued, were properly considered by the board under G. L. c. 140, § 9. *Id.* at 322-323. The petitioner in *Miami Grove* did not attack § 9 as unconstitutionally vague, however.

Without judicial construction § 9, as applied to Saxon, must fall as having provided insufficient notice[5] to Saxon

---

[5] The board's notice of hearing to Saxon had appended to it the two police reports, and included a statement that the board might, after hearing evidence, decide "not to take any action, or it may decide to modify,

and inadequate standards to the board. See *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 134 (1949) (regulation void because it "prohibits nothing specific," "contains no standards," and "could lead to arbitrary and discriminatory action"). We take this opportunity to construe the phrase "in an improper manner" in a way which will suffice for the purpose of future cases. See *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Comm'n, (No. 2),* 374 Mass. 564, 566 (1978). See also *Commonwealth* v. *Klein,* 372 Mass. 823, 833 (1977).

Saxon points to the statute governing the revocation of licenses for the sale of alcoholic beverages, G. L. c. 138, § 64, and urges us to construe § 9 similarly. Section 64 allows revocation "upon satisfactory proof that [the licensee] has violated or permitted a violation of any condition [of the license], or any law of the commonwealth."

The standard for revocation in other licensing statutes ranges from allowing revocation "at pleasure" or "at any time" without a hearing (e.g., G. L. c. 140, §§ 49, 54, 56A, 70) to requiring proof, after notice and hearing, of the violation of certain specified statutory provisions or of other specific acts (e.g., G. L. c. 140, §§ 34, 59, 125, 185C). Those in the middle of this range provide certain standards and call for notice and hearing. See, e.g., G. L. c. 140, § 30 ("that the licensee is unfit to hold the license"); *id.,* § 32C (if board of health examination finds establishment "to be in an unsanitary condition"); *id.,* § 46Q (if licensee or employee "is guilty of any immoral, fraudulent or illegal conduct in connection with the operation of such [employment] agency" or violates specified statutory conditions); *id.,* § 185H ("for just cause"); G. L. c. 221, § 40 ("deceit, malpractice or other gross misconduct"). See also various sections of

---

suspend or revoke the license, to issue a warning notice, or to place the licensee on probation for a period of time." It further stated, however, that the hearings would be conducted pursuant to the provisions of G. L. c. 138, §§ 23, 64, the liquor license statute. It made no mention of G. L. c. 140, § 9.

Saxon raises the question of insufficient notice only indirectly in its brief. In view of our disposition of the case, we do not decide this question.

G. L. c. 112, (registration of members of certain professions).[6]

We do not here consider the validity of statutes allowing revocation at will or pleasure without notice or hearing. See generally *Milligan* v. *Board of Registration in Pharmacy*, 348 Mass. 491, 495-496 (1965). In any State regulation of private occupations and endeavors, however, there must be a "reasonable relation between the type of regulation undertaken and significant aspects of the public interest." *Id.* at 497, and cases cited. In the case of common victuallers, the licensing authority may regulate to ensure that eating establishments are operated in a manner consistent with public health and safety and that the victualler is complying with the provisions of G. L. c. 140, §§ 5-8, 18, and any regulations validly promulgated under *id.*, § 19. See *Mayor of Everett* v. *Superior Court*, 324 Mass. 144, 147 (1949). In addition, the performance of illegal acts (or the knowing allowance of the performance of such acts by others on the premises) would constitute operation "in an improper manner." See *Aristocratic Restaurant (No. 1), supra; Miami Grove, supra.* Therefore, we would not limit the phrase "improper manner" to be coextensive with G. L. c. 138, § 64, as urged by Saxon, but would require that "improper" acts be related to the operation of the licensed establishment.

A common victualler cannot constitutionally lose his license because he serves food or beverage to known criminals, or because he refuses to ask customers to leave his establishment, simply because they are known criminals.[7] In the context of the present case, something more than that had to be found by the board in order to revoke Saxon's license. If the board had found, with the support of substantial evi-

---

[6] Any State agency which has license revocation powers and is subject to the State Administrative Procedure Act is subject to the requirements of that act in revocation proceedings. G. L. c. 30A, § 13. See *Milligan* v. *Board of Registration in Pharmacy*, 348 Mass. 491 (1965).

[7] Section 5 of c. 140 requires that common victuallers "shall at all times be provided with food for strangers and travelers." See *Commissioner of Corps. & Taxation* v. *Chilton Club*, 318 Mass. 285, 290 (1945).

dence in the record, that the management of Saxon know-
ingly allowed prostitutes, while inside the coffee shop, to
solicit customers who were inside or outside the shop, it
would have had grounds for revocation. We next examine
whether the board's findings are consistent with this inter-
pretation of § 9, and if so whether they are supported by
substantial evidence.

3. *Relevant findings by the board.* The findings made
by the board are set out earlier in this opinion. The only
findings which may properly be relevant under the phrase
"improper manner" are findings number 1, 3, and the first
sentence of 7. Finding 2 is relevant, but is simply a factual
finding that Andreou owns the building, including the cof-
fee shop. Findings 1 and 3 concern alleged illegal conduct
within the shop itself. Finding 3 concerns the continuation
of that illegality in upstairs apartments, which, if shown to
be part of a "pattern" whereby solicitation occurs in the cof-
fee shop and then acts are performed in upstairs apart-
ments, would bear on the propriety of the manner in which
the coffee shop is operated.

Finding 4 is somewhat vague and therefore difficult to
relate to the phrase "improper manner." If the evidence
supported an inference that the management knowingly
and intentionally obstructed police investigation of solicita-
tion in the coffee shop, number 4 might be relevant. If,
however, it refers solely to the refusal of the management to
eject customers who were "known prostitutes," it is not rel-
evant. Finding 4 is an example of the need for administra-
tive bodies to make subsidiary findings and to state their
reasons for progressing from subsidiary facts to the ultimate
decision. See *School Comm. of Chicopee* v. *Massachusetts
Comm'n Against Discrimination*, 361 Mass. 352, 355 (1972).

Finding 5 is not relevant. There is no duty of a common
victualler to determine the occupations of his patrons. Find-
ing 6, which appears to deal with the uses to which the up-
stairs apartments are put, could only be relevant to the com-
mon victualler's license if the "pattern" discussed above is
supported by the evidence as already indicated above in the

discussion of finding 3. As to finding 7, although a finding that illegal acts do not occur on nearby premises, if supported, might bear upon the extent to which Saxon's management allows or encourages illegal acts on Saxon's premises, the board cannot justifiably revoke a license because of "the attitude of management," without more specific subsidiary findings.

4. *Substantial evidence test.* Taken together, the relevant findings would, if supported by the evidence, justify a revocation of Saxon's license under the construction of § 9 herein. We now turn to the question whether the relevant findings are supported by substantial evidence.

The standard for review of the evidence in certiorari cases, where G. L. c. 30A does not apply, is effectively the same as that under c. 30A, § 14 (7) (*e*), as appearing in St. 1973, c. 1114, § 3. *Boston Edison Co.* v. *Selectmen of Concord, supra* at 92. Chapter 30A defines "substantial evidence" as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.,* § 1 (6). The test does not mean only that there was "some evidence" or "any evidence" which might rationally create an inference. *Cohen* v. *Board of Registration in Pharmacy,* 350 Mass. 246, 253 (1966). Questions of credibility, or the resolution of "fairly conflicting views," are for the agency (or, in this case, the board), and not the court. *School Comm. of Wellesley* v. *Labor Relations Comm'n,* 376 Mass. 112, 120 (1978).

Counsel for the board conceded in oral argument that there was not substantial evidence that solicitation occurred inside the coffee shop. We give effect to that concession. The only testimonial evidence of that fact is one statement by Police Officer Fleming that "it had become obvious that the girls were using the coffee shop and were using the various apartments upstairs for solicitation." There were no observations by either police officer to support an inference that the women were using the premises for solicitation. Indeed, phrased as it is conjunctively, this statement could be interpreted to mean that solicitation occurred only upstairs. The first police report stated that "at times as many as fif-

teen prostitutes were on the premises some of whom would be indicating to, [*sic*] male passersby who were either on foot or in cars to join them." Saxon contends that the report was not properly admitted in evidence before the board, a question we need not decide. In our view this allegation in the police report adds little, if anything, to the substantiality of the evidence of solicitation inside the coffee shop. The officers who conducted the investigation testified at the hearing, and thus had every opportunity to substantiate the conclusion that solicitation occurred inside the shop. They did not do so, and the result is that the principal finding which could justify revocation of Saxon's license is unsupported by substantial evidence.

5. *Conclusion.* In view of our conclusions discussed above, the decision of the board must be annulled.

*Judgment reversed.*