**HARD TIMES CAFE, INC., Relator,**

v.

**CITY OF MINNEAPOLIS,
et al., Respondents.**

**No. C4–00–1060.**

Court of Appeals of Minnesota.

April 24, 2001.

---

**6.** State Farm conceded at oral argument that public policy is not implicated.

Jordan S. Kushner, Law Office of Jordan S. Kushner, Minneapolis, MN; and Larry B. Leventhal, Larry B. Leventhal & Associates, Minneapolis, MN; and Robert Dildine, Law Office of Robert Dildine, Minneapolis, MN, (for relator).

Jay Heffern, Minneapolis City Attorney, Timothy S. Skarda, Assistant City Attorney, Minneapolis, MN, (for respondent).

Considered and decided by LANSING, Presiding Judge, CRIPPEN, Judge, and KALITOWSKI, Judge.

## OPINION

KALITOWSKI, Judge

Relator Hard Times Cafe, Inc., challenges the decision of respondent City of Minneapolis not to renew its business licenses for a period of one year. Relator contends (1) the city charter provision authorizing license revocation for "good cause" is unconstitutional; and (2) respondent's decision should be modified because it was arbitrary and capricious, made upon unlawful procedure, unsupported by substantial evidence, and affected by error of law.

## FACTS

Unless otherwise noted, the following facts and quotations are taken from the findings of the Administrative Law Judge (ALJ) who presided over the hearing regarding relator Hard Times Cafe's business licenses. Hard Times Cafe, Inc., is a restaurant, sidewalk cafe, and tobacco merchant located at 1821 Riverside Avenue in Minneapolis, Minnesota. The cafe has been licensed by the City of Minneapolis since 1993 and operates as an employee-owned cooperative. Decisions concerning the cafe are made by majority vote of the members, much like a partnership. Although some members of the cooperative are considered officers such as presi-

dent, vice president, or treasurer, these titles do not confer management responsibilities because

persons identified as officers of the cooperative hold those positions for the purpose of completing and signing forms and have no actual authority greater than other members.

In 1993 and 1995, complaints were lodged against the cafe regarding increased graffiti, litter, and loitering in front of the cafe. The record indicates relator addressed these concerns by working with the Licenses and Consumer Services Technical Advisory Committee (TAC), which was made up of representatives of the Hard Times Cafe, local business associations, neighborhood groups, property owners, and the City of Minneapolis. As a result, a bus stop that encouraged loitering was moved away from the front of the cafe, and the cafe restricted its operating hours, installed security lighting, fenced in the parking lot behind the cafe, and removed a wall that was being used as a bench by people near the sidewalk.

In the spring of 1999, after receiving complaints from neighboring businesses about loitering and drug dealing occurring outside the Hard Times Cafe, the Minneapolis Police Department (MPD) organized an undercover operation to target "illicit activity occurring in the vicinity of the Hard Times Cafe." From October 8, 1999, through January 14, 2000, officers visited the cafe to observe activity.

During October 1999, the MPD observed little suspicious conduct at the cafe. On one occasion, a man approached an officer outside the cafe and told her "he knew where to get good 'weed.'" Later, the officer entered the cafe where an intoxicated male asked if she "liked to get high."

In November 1999, an officer purchased $20 worth of marijuana from an individual inside the cafe. She negotiated this purchase at a "table that was obscured from the view of anyone at the service counter." This officer also observed several individuals engaged in what she perceived to be hand-to-hand exchanges of controlled substances. On two occasions individuals asked an officer if she was interested in purchasing marijuana.

On three separate occasions in December 1999, an officer purchased marijuana from individuals inside the cafe, and once, an officer purchased $10 worth of marijuana from an apartment rented by relator above the cafe. In addition, Martin Johnson, vice president of the cafe, offered to sell marijuana to an undercover officer.

In January 2000, officers observed people smoking marijuana and an unknown substance in the apartment above the cafe and exchanging money for what appeared to be small bags. Officers purchased crack cocaine and hallucinogenic mushrooms inside the cafe. Also, Johnson took an officer to the apartment above the cafe and sold her marijuana.

On January 26, 2000, the MPD executed search warrants to search the cafe and the apartment above it. Patrons were also searched, and officers retrieved a marijuana pipe and a small bag of marijuana from one patron and an open bottle of vodka from another.

Near the time of the search, the MPD issued a press release that detailed the results of the undercover operation and indicated the involvement of "the apparent co-owner of the Hard Times Cafe, Martin Duane Johnson." Johnson was charged with violating the sale of a controlled substance statute, but the cafe itself was not found to have engaged in illegal activity.

Also on January 26, 2000, the Minneapolis Environmental Health Department inspected the cafe and found several viola-

tions. But, many of the cleanliness violations "were the direct result of the disorder left behind by the police search and prevention of the employees from cleaning the premises."

The Hard Times Cafe was closed after the police search. While closed, the cooperative initiated policy changes to address public concerns about safety and illegal conduct. For example,

[c]ustomers and former members [of the cooperative] were no longer allowed to go behind the counter or store any personal property on the premises. Only employees could use the telephone in the kitchen. The probation period for workers seeking to become members was extended from six months to eighteen months. Every person identified from police reports as being involved in drug transactions was banned from the Hard Times Cafe. Johnson was terminated from employment with the Hard Times Cafe. Rental of the apartment above the [cafe] was discontinued. New mirrors were installed to enable observation of the blind spots in the seating area. A door policy was instituted to restrict entry. To enter the premise, patrons exchange a dollar for a voucher that can be used for purchases in the Hard Times Cafe. An incident log has been instituted to record events occurring in the [cafe] and communicate any problems to all shifts.

Relator also entered into an agreement with its landlord to prohibit the presence of controlled substances and alcohol on its premises. In addition, the agreement prohibited persons from loitering without making a food purchase. After relator's members corrected the violations reported by the health department, the cafe was reopened.

On February 15, 2000, relator's officers submitted an application to renew its food license. On February 23, 2000, an attorney for the city issued a Notice of Complaint and Notice of Hearing to relator, informing its officers that evidence of the police investigation would be presented before an ALJ to demonstrate cause for adverse action against its licenses. Adverse action was described in the notice of complaint as "revocation, suspension, fines, and other penalties or conditions." The attorney also informed relator that the hearing would be conducted pursuant to sections 14.57 to 14.62 of the Minnesota Administrative Procedure Act.

On March 28, 2000, a contested case hearing was held before an ALJ. On April 28, the ALJ issued findings of fact, conclusions of law, and a memorandum. The ALJ found that the police investigation and search "did not reveal evidence of involvement by the [cafe] in the selling of controlled substances." The ALJ further explained that

[T]he layout of the premises makes observation of the activities in the seating area difficult, at best. Much of the conduct described as 'narcotics-related activity' is indistinguishable from persons having normal conversations. Movement by particular persons in and out of the premises is easily observable from the seating area by a person looking for that conduct. The same activity may go entirely unnoticed by a single employee who is taking orders for food, filling those orders, ringing up sales on the cash register, making change, and otherwise performing tasks required to [keep] the business operating.

Ultimately, the ALJ determined that because "[e]very business is responsible for illegal activity on its premises," respondent had demonstrated good cause to subject relator to some level of discipline. But the ALJ went on to comment that

the drug transactions that occurred were not obvious to the employees of the Hard Times Cafe * * * [and that n]o one from the MPD (or any other agency of the City) ever informed the Hard Times Cafe that drug trafficking was suspected on its business premises.

The ALJ elected not to make a recommendation regarding any specific disciplinary action to be taken against relator by the city council.

The ALJ's findings of fact and conclusions of law were delivered to Minneapolis City Council members and the matter was scheduled for presentation to the Public Safety & Regulatory Services Committee (PS & RS) on May 31, 2000. Because the presentation before the PS & RS was the first of its kind under the newly promulgated procedures contained in the License Adverse Action Procedures Manual (Manual), an attorney for the city sent a letter to the committee chair containing excerpts from this Manual. These excerpts, in part, instructed the committee to avoid ex parte contacts, base its decision solely on the record, and not make its final decision until after the hearing. The letter also warned that the procedures outlined in the Manual "should be strictly adhered to in order to minimize any subsequent legal challenges to the decision reached by the Committee and City Council."

On May 15, 2000, relator filed exceptions to the ALJ's findings of fact and conclusions of law. In part, it disputed the ALJ's statement that it had not taken any steps to prevent illegal activity.

On May 31, 2000, the PS & RS considered whether to take adverse action against the licenses held by relator. After statements from the city attorney and counsel for relator, and comments from several committee members, the PS & RS, by a split vote, recommended that the city council deny renewal of relator's licenses.

On June 9, 2000, the Minneapolis City Council considered whether to take adverse action against the licenses held by relator. There were no comments made by council members concerning why they opposed renewal of relator's licenses. The only discussion was from members opposed to denying renewal of relator's licenses. Several council members expressed concern that the proposed punishment was too harsh and two council members raised concerns that the council was improperly basing its decision on information outside the record. One of the council members stated:

> What was really disconcerting to me was that yesterday during our Caucus, we basically got a lot of additional information about TAC Hearings, et cetera, and we're not allowed to really include that in our decision, based on the rulings that we got from the ALJ.

Another member commented that "yesterday we were talking about 911 calls. There was nothing in the record about that."

In response to a council member's question about what information the council appropriately could consider in making its licensing decision, the Minneapolis City Attorney stated that

> the City Council * * * must base its decision on the record. That's the report of the Administrative Law Judge, that's the written exceptions if any that were filed, that's the testimony in front of the Committee and the arguments before the Committee, that's the exhibits and documents that were submitted in this hearing process. * * * It's my view that as you consider the appropriate adverse action in this situation, that you should be constrained by the facts that the Administrative Law Judge found in this matter.

After additional discussion by members opposed to adverse action against relator, the proposal to deny renewal of relator's licenses for one year passed by a vote of seven to five.

Relator filed an appeal by writ of certiorari on June 22, 2000. In August 2000, relator moved for correction of the record, asserting that the ALJ transcript should be excluded because it was not available to the city council at the time it made its decision, and that respondent failed to include certain materials in the record. On August 24, 2000, this court issued an order requiring respondents to make a decision regarding the proper contents of the record for appeal. Respondents filed their decision on September 8, 2000. Relator subsequently renewed its motion to correct the record. On October 17, 2000, this court ordered that the transcript of the proceedings before the ALJ was not properly part of the record.

In addition, relator presented materials to this court that were not part of the proceedings before the ALJ for the purpose of demonstrating that the council impermissibly considered these materials in making its decision. This court deferred to the panel assigned to consider this appeal the issue of whether these extra-record materials submitted by relator should be considered.

## ISSUES

1. Is the "good cause" standard which authorizes the Minneapolis City Council to revoke licenses constitutional?

2. Was the Minneapolis City Council's decision not to renew relator's business license unlawfully affected by irregularities in procedure?

## ANALYSIS

### I.

The Minneapolis charter at issue provides:

Any license issued by authority of the City Council may be revoked by the City Council at any time upon proper notice and hearing for *good cause.*

Minneapolis, Minn., City Charter ch. 4 § 16 (2001) (emphasis added). Relator contends that because the phrase "good cause" is not defined this provision authorizing the city council to revoke licenses is unconstitutional. We disagree.

■■■ "The constitutionality of an ordinance is a question of law" which this court reviews de novo. *State v. Castellano,* 506 N.W.2d 641, 644 (Minn.App.1993) (citations omitted). A municipal ordinance is presumed constitutional. *City of St. Paul v. Dalsin,* 245 Minn. 325, 329, 71 N.W.2d 855, 858 (1955). The burden of proving that an ordinance is unreasonable "rests on the party attacking its validity." *Id.* (citation omitted); *State v. Hyland,* 431 N.W.2d 868, 872 (Minn.App.1988). Courts should exercise extreme caution before declaring a statute void for vagueness. *Getter v. Travel Lodge,* 260 N.W.2d 177, 180 (Minn. 1977).

■■■ "Vague statutes are prohibited under the due process clause of the fourteenth amendment." *Hyland,* 431 N.W.2d at 871 (citation omitted). A statute is void due to vagueness if it "defines an act in a manner that encourages arbitrary and discriminatory enforcement," or the law is so indefinite that people "must guess at its meaning." *Humenansky v. Minnesota Bd. of Md. Exam'rs,* 525 N.W.2d 559, 564 (Minn.App.1994) (citations omitted), *review denied* (Minn. Feb. 14, 1995); *Ruzic v. Commissioner of Pub. Safety,* 455 N.W.2d 89, 91 (Minn.App.1990), *review denied* (Minn. June 26, 1990). The use of general language in a statute does not make it vague. *State v. Christie,* 506 N.W.2d 293,

301 (Minn.1993). An entity challenging the constitutionality of a statute on vagueness grounds "must show the [ordinance] lacks specificity as to [its] own behavior rather than some hypothetical situation." *Ruzic*, 455 N.W.2d at 92 (citation omitted).

In applying the ordinance language here, the ALJ found that multiple drug transactions occurred on and around relator's business premises, and an employee and several patrons were arrested for selling drugs on premises. We cannot say that ordinary people would have to guess that such activity was of the type that constituted good cause for possible adverse action with regard to a license. Moreover, the charter specifically provides that a license may be revoked

> upon conviction before any court of any person holding such a license for a violation of the provisions of any law, ordinance or regulation relating to the exercise of any right granted by such license.

Minneapolis, Minn., City Charter, ch. 4, § 16. Thus, reading the charter in its entirety, it is clear that a license holder's violation of laws relating to the exercise of a right granted by the license could lead to revocation.

Here, although the cafe itself was not found to have violated any laws, illegal activity that arguably posed a threat to public safety occurred on its premises. Because of relator's association with this illegal activity, it did not have to "guess" that it might be subject to license revocation. *See City of Saint Paul v. Franklin*, 286 Minn. 194, 198, 175 N.W.2d 16, 18 (1970) (finding that ordinance prohibiting keeping a disorderly house was not unconstitutionally vague as applied to appellant). In fact, relator concedes that if this court accepts the ALJ's findings, at least minimal sanctions against it are justified. Thus, the "good cause" standard is definite enough so that relator knew it would be subject to adverse action. Relator simply disagrees with the severity of the sanction. We conclude that the "good cause" standard contained in chapter four of the Minneapolis City Charter does not render the statute constitutionally infirm.

We reject relator's contention that *Saxon Coffee Shop v. Boston Licensing Bd.*, supports its argument that the city charter at issue is unconstitutionally vague. *Saxon Coffee Shop v. Boston Licensing Bd.*, 380 Mass. 919, 925, 407 N.E.2d 311, 316 (1980) (reversing licensing board's decision to revoke a business's license because court found the regulation permitting the board to revoke a license "[i]f a licensee * * * conducts his licensed business in an improper manner" was unconstitutional) (quotation omitted). *Saxon* is distinguishable. First, the court in *Saxon* treated the case as criminal in nature and thus, applied a stricter standard than is applicable here. *Id.* Second, the *Saxon* court noted that "[n]either party has incorporated into the record or called our attention to any regulation which might mitigate the vagueness of the phrase 'improper manner.'" *Id.* at 926, 407 N.E.2d at 316. But here, as noted above, chapter 4, section 16, in its entirety, provides guidance as to the type of behavior that could lead to license revocation, thereby mitigating any alleged vagueness. Finally, the management of the coffee shop in *Saxon* was not found to have engaged in any illegal conduct. *Id.* at 928–29, 407 N.E.2d at 318 (stating that if management had knowingly allowed prostitution on its premises, the board would have had grounds for revocation). Although the ALJ found relator's management was not directly involved in illegal activity, its employee-member vice president was arrested for selling marijuana and drug sales occurred on the premises. In conclusion, unlike the situation in *Sax-*

*on,* the ordinance at issue here is not unconstitutionally vague.

## II.

■ In reviewing the procedures used by respondent in making its decision relator contends our review is governed by the Minnesota Administrative Procedure Act (MAPA). We agree. MAPA defines a contested case as

> a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined after an agency hearing.

Minn.Stat. § 14.02, subd. 3 (2000). An "agency" is defined as

> any state officer, board, commission, bureau, division, department, or tribunal, other than a judicial branch court and the tax court, having a statewide jurisdiction and authorized by law to make rules or to adjudicate contested cases.

*Id.,* subd. 2 (2000). Under section 14.02, subdivision 2, the Minneapolis City Council is not considered an agency because it does not have statewide jurisdiction. *See City of Mankato v. Mahoney,* 542 N.W.2d 689, 693 (Minn.App.1996). But appellate cases often cite MAPA as the standard for reviewing city council decisions. *In re License of West Side Pawn,* 587 N.W.2d 521, 523 (Minn.App.1998), *review denied* (Minn. Mar. 30, 1999); *Mahoney,* 542 N.W.2d at 691–92. In addition,

> some local units of government either incorporate by reference all or some of [MAPA's] procedural provisions by official action, or statutes occasionally direct that certain portions of them apply to specified local proceedings.

21 William J. Keppel, *Minnesota Practice,* § 1.03 (1998). Here, communications from an assistant city attorney informed both the city council and relator that "[t]he hearing will be conducted in accordance with the requirements of Minnesota Statutes § § 14.57 to 14.62." Sections 14.57 through 14.62 govern contested case procedures under MAPA. Because the city elected to be governed by MAPA, we conduct our analysis pursuant to MAPA.

■ Under MAPA,

> [this] court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
>
> (a) In violation of constitutional provisions; or
>
> (b) In excess of the statutory authority or jurisdiction of the agency; or
>
> (c) Made upon unlawful procedure; or
>
> (d) Affected by other error of law; or
>
> (e) Unsupported by the substantial evidence in view of the entire record as submitted; or
>
> (f) Arbitrary or capricious.

Minn.Stat. § 14.69 (2000); *see West Side Pawn,* 587 N.W.2d at 523. Review is limited to "the record before the city council at the time it made its decision." *West Side Pawn,* 587 N.W.2d at 523 (citing Minn.Stat. § 14.68).

■ Relator argues respondent's decision was improper because the city council utilized unlawful procedures in making its decision. Relator contends that the only way this court can determine whether the procedures were unlawful is to consider the extra-record materials submitted by relator. We agree. Ordinarily, our review is confined to the record. Minn.Stat. § 14.68 (2000). But in cases where "irregularities in procedure, not shown in the record" are alleged, this court "may transfer the case to the district

court" so that it may determine whether there were any "irregularities in procedure." *Id.* In order to determine whether transfer to the district court is appropriate, we will examine the extra-record materials to determine whether there is substantial evidence of irregularities.

■ The city council was to make its decision in accordance with its Manual. This Manual prohibited the council from allowing or initiating ex parte contacts, forming an opinion as to sanctions until after the close of all hearings, and considering material outside the record. Based on the materials submitted to us, it is undisputed that the city council violated both the procedures set forth in the Manual and the explicit instructions of the city attorney. Comments made during the June 9, 2000, city council hearing indicate that the council organized a caucus to discuss the matter of relator's licenses. At this caucus, outside witnesses were brought in and information was presented regarding the volume of 911 calls made concerning the Hard Times Cafe. No evidence concerning 911 calls had been presented to the ALJ.

In addition, relator has presented considerable additional evidence of irregularities in procedure. Extra-record materials demonstrate that a council member sent an E-mail to a staff member stating that

we better plan on a full-court press at the [DFL] caucus. Let[']s have all of the police and SAFE people who worked on this issue there for resources AND to let [council members] see them. * * * [A]t the very least, we need [council members] NOT [to] vote again[st] the PSRS recommendation.

The contents of this E-mail suggest both that council members made up their minds before the license revocation process was completed, and that members promoted the consideration of information that was not presented to the ALJ. In another E-mail a council member stated to a constituent that the

[c]ity licensing staff tried numerous times to meet with the leadership of [the] Hard Times in the effort to resolve complaints * * * [but experienced] frustration at being able to accomplish this objective.

Not only was there no evidence before the ALJ that relator refused to cooperate with the city but to the contrary, the ALJ specifically documented the past and current efforts of relator to cooperate.

"Governmental bodies must take seriously their responsibility to develop and preserve a record that allows for meaningful review by appellate courts." *In re Livingood,* 594 N.W.2d 889, 895 (Minn. 1999). Confining our review solely to the record before us, we cannot determine with certainty whether the evidence supports respondent's decision. Considering the harshness of the penalty exacted against relator compared with the ALJ's positive findings, the absense of findings by respondent justifying its decision and the admission of one of the council members that respondent was exposed to prohibited information, we cannot avoid the conclusion that respondent's decision may have been improperly influenced.

We conclude that it is impossible for us to untangle these improper influences from respondent's final decision, and determine whether the evidence in the record supports the council's decision. Therefore, based on relator's extensive documentation of alleged irregularities in procedures, we are exercising our authority to transfer this case to the district court pursuant to section 14.68, so that it may "take testimony and * * * hear and determine the alleged irregularities in procedure."

## DECISION

We affirm respondent's authority to revoke any license it issues upon proper notice and hearing for "good cause" because this standard is not so vague that it constitutes a violation of due process. We transfer this case to this district court so that it may investigate the alleged irregularities in procedures regarding respondent's decision to revoke relator's license.

**Affirmed in part and transferred to the district court.**