COMMISSIONER OF LABOR AND INDUSTRIES *vs.*
WORCESTER HOUSING AUTHORITY.

Worcester.    April 9, 1979. — August 31, 1979.

Present: HALE, C.J., ARMSTRONG, & DREBEN, JJ.

*Housing. Labor*, Wages. *Statute*, Construction. *Words*, "Prevailing wage."

In setting rates under G. L. c. 121B, § 29, for maintenance aides employed by a city's housing authority, the Commissioner of Labor and Industries was not required by c. 149, § 26, to set the rates at the rate paid to laborers in the construction industry but was authorized to make comparisons with jobs outside that industry. [309-311]

In setting rates under G. L. c. 121B, § 29, the Commissioner of Labor and Industries was not required by c. 149, § 26, to set rates at the rate paid under the collective bargaining agreement which provided for the highest rate but was authorized to set them at the "prevailing wage." [311-312]

CIVIL ACTION commenced in the Superior Court on January 25, 1977.

The case was heard by *Meagher, J.*

*Matthew R. McCann (James F. Cosgrove* with him) for the defendant.

*Guy A. Carbone* for the plaintiff.

DREBEN, J. The Worcester Housing Authority (authority) appeals from a judgment upholding the rates set by the Commissioner of Labor and Industries (Commission-

er) for certain CETA[1] workers formerly employed by the authority as maintenance aides. The authority was also ordered to make retroactive payments to these employees. The trial judge found that the Commissioner considered himself legally constrained by G. L. c. 121B, § 29, and G. L. c. 149, §§ 26 and 27, to set the rates for the CETA workers at the rate paid to laborers in the construction industry under the collective bargaining agreement which provided for the highest rates. The judge upheld the rates as "not arbitrary." We reverse because the Commissioner misconceived the extent of his statutory authority in setting the rates.

The essential facts are not in dispute. In 1974, the authority, which owns and operates a number of housing projects in Worcester, learned that it could obtain CETA workers from the city of Worcester at no expense to the authority. The CETA workers were hired to do maintenance work, freeing the authority's regular maintenance force to handle a backlog of repairs. The plan was for the authority to pay the workers at the rate paid by the city to its CETA workers, namely $3.59 an hour, and then be reimbursed by the city.

The Commissioner claimed, however, that the rates to be paid to the CETA workers were to be determined by him under G. L. c. 121B, § 29. After some correspondence with the authority, he set the rates for the CETA workers at a level significantly higher than the level of rates being paid by the city.[2] The rates so set were the same as those set by the Commissioner for the authority's regular maintenance aides even though the latter were more skilled

---

[1] Comprehensive Employment and Training Act of 1973, Pub. L. No. 93-203, 87 Stat. 839 (1973).

[2] The Commissioner, in a letter dated March 12, 1976, directed the authority to pay the hourly rates and health benefits for the period from December, 1973, to the date of the letter as set forth below.

| 12/73 - 12/74 | $5.20 + .40 |
| 12/74 - 12/75 | $5.60 + .40 |
| 12/75 - current | $6.00 + .50 |

and had more responsibilities. In setting the rates, both for the regular maintenance employees and also for the CETA workers, the Commissioner made no investigation and looked solely to the collective bargaining agreement known to his office to have the highest rates for building construction laborers.

Since the authority had no funds to supplement the city grant, the authority in April of 1976 discharged the CETA workers and terminated the program. The Commissioner brought this action seeking back pay for the discharged workers.

Before reaching the questions of statutory construction raised by the parties, we note that the authority has shown no basis for its claim that the Commissioner's rate setting powers are preempted by Federal regulations relating to the payment of CETA workers. Section 96.34 of 29 C.F.R. (1978) sets no wage rates but merely provides that CETA workers shall not be paid below certain minimum rates. While the regulations limit the amount of Federal funds which can be paid to a single worker in a given calendar year, they do not limit the amount the employee may receive from other sources. The regulations are not facially inconsistent with G. L. c. 121B, § 29, or G. L. c. 149, §§ 26 and 27, and the authority has not shown any conflict[3] or other reason to find Federal preemption.

The Commissioner claims that the rate set for the CETA workers was legally required and that he had no discretion under applicable law to set any other rate. His argument is in two parts. First, he contends that the case of *Commissioner of Labor & Indus.* v. *Boston Housing*

---

[3] No Federal or State official involved in the controversy, other than the authority, considered there to be a conflict between Federal and State law. Contrast *Commissioner of Labor & Indus.* v. *Boston Housing Authy.*, 345 Mass. 406, 411 (1963). The authority alleges error in the exclusion by the trial judge of material received from the Department of Housing & Urban Development. Even if this material were received in evidence it would not indicate any conflict.

*Authy.*, 345 Mass. 406 (1963), requires him to look solely to the construction industry for the classification of employees, that in the construction industry the closest classification is that of laborer, and that there is no lower classification of worker in that industry. There is, therefore, no point in his making any job comparisons, even though the duties of the authority's maintenance workers are, in all probability, different from those of laborers in the construction industry. The second part of his argument is that § 26 of c. 149, as amended through St. 1967, c. 296, §§ 2 and 3, charges him with setting rates at "not less than the rates" established by collective bargaining agreements. This means that he must select from the family of applicable agreements the one agreement which sets the highest hourly wage rates for construction laborers. Otherwise, if he excludes an agreement which has a higher wage rate than the agreement selected, he is violating a proviso of the statute.

We reject both prongs of the Commissioner's argument. The primary provision governing this action is G. L. c. 121B, § 29, as amended through St. 1973, c. 1215, §§ 9, 9A.[4] The relevant portion appears in the margin,[5] and it provides that a housing authority in the administration and development of its projects shall pay its "architects,

---

[4] We note that the pertinent provision of § 29 has remained unchanged since its insertion into the General Laws by St. 1969, c. 751, § 1 (see St. 1977, c. 610; St. 1978, c. 393, § 34).

[5] "In the development or administration of a project which is not federally aided, a housing authority shall furnish the commissioner of labor and industries . . . with a list of the classifications of work performed by all architects, technical engineers, draftsmen, technicians, laborers and mechanics employed therein. . . . Said commissioner shall determine rates of wages and . . . shall furnish the housing authority with a schedule of such rates . . . . The rates of wages and fees paid by each housing authority to such architects, technical engineers, draftsmen, technicians, laborers and mechanics shall not be less than those determined by said commissioner who shall set the rate at no less than eighty percent of the prevailing wage in accordance with sections twenty-six and twenty-seven of chapter one hundred and forty-nine."

technical engineers, draftsmen, technicians, laborers and mechanics" wages set by the Commissioner, at no less than eighty percent of the "prevailing wage" set "in accordance" with c. 149, §§ 26 and 27. Section 26, also set forth in part in the margin,[6] provides, inter alia, that "laborers" employed in the "construction of public works" shall not be paid less than the rate determined by the Commissioner. He is to set the rate for laborers at not less than the rate paid to "laborers in the municipal service of the town" where the work is being constructed, provided that if "a wage rate or wage rates have been established *in certain trades and occupations* by collective agreements," "the rate or rates to be paid . . . shall not be less than the rates so established." If no rate has been so established, the wages of "laborers" . . . "shall not be less than the wages paid to the employees *in the same trades and occupations* by private employers engaged in the construction industry" (emphasis supplied).

---

[6] Chapter 149, § 26, as amended, reads in part, "In the employment of mechanics and apprentices, teamsters, chauffeurs and laborers in the construction of public works by the commonwealth, or by a county, town or district, or by persons contracting or subcontracting for such works, preference shall first be given to citizens of the commonwealth . . . . The rate per hour of the wages paid to said mechanics and apprentices, teamsters, chauffeurs and laborers in the construction of public works shall not be less than the rate or rates of wages to be determined by the commissioner as hereinafter provided; provided, that the wages paid to laborers employed on said works shall not be less than those paid to laborers in the municipal service of the town or towns where said works are being constructed; provided, further, that where the same public work is to be constructed in two or more towns, the wages paid to laborers shall not be less than those paid to laborers in the municipal service of the town paying the highest rate; provided, further, that if, in any of the towns where the works are to be constructed, a wage rate or wage rates have been established in certain trades and occupations by collective agreements or understandings between organized labor and employers, the rate or rates to be paid on said works shall not be less than the rates so established; provided, further, that in towns where no such rate or rates have been so established, the wages paid to mechanics, teamsters, chauffeurs and laborers on public works, shall not be less than the wages paid to the employees in the same trades and occupations by private employers engaged in the construction industry."

Since c. 149, § 26, relates to the construction of public works and c. 121B, § 29, relates to the development and administration of housing projects, there are some positions within a housing authority for which there is no analogue in the public construction field. This, of course, is the reason for the present dispute with respect to the rates for the CETA maintenance workers. A similar problem arose in *Commissioner of Labor & Indus.* v. *Boston Housing Authy.,* 345 Mass. 406 (1963), where the Boston Housing Authority challenged, inter alia, the authority of the Commissioner to set rates for janitors under c. 121, § 26T (as amended through St. 1960, c. 491), which, in relevant part, is the same provision as the portion of c. 121B, § 29, applicable here.[7] The court held that § 26T "must be construed as authorizing the [C]ommissioner to set wage rates for all the lower paid employees," (*id.* at 417) including janitors, even if there were no category in the construction field comparable to that of a janitor. The court also said that since the Legislature specifically referred to the prevailing wage under c. 149, § 26, rather than to a standard for maintenance workers, "the Commissioner under § 26T *may* reasonably use a rate of eighty percent of the prevailing wage rate of the most nearly comparable class of construction worker, giving due consideration to the differences and similarities in ... skills ... hazards, ... responsibilities ... and similar matters. On this record, we cannot say that the [C]ommissioner erred in setting the rates for janitors ..."[8] (emphasis supplied). *Id.*

---

[7] The only substantive change is that c. 121B, § 29, now excludes "federally aided projects." The CETA workers whose wages are here in dispute worked only on projects which were not "federally aided."

[8] The opinion does not indicate the method by which the Commissioner determined the rates. The Federal officials (P.H.A.) made a "comprehensive survey of the prevailing wage rates," *id.* at 409, but the Commissioner "did not make a survey similar to that made by P.H.A." *Id.,* n.6 at 410.

It should be noted that the court did not require the Commissioner to use the rates of construction laborers. See also *id.* at 412. The court merely held that the Commissioner *"may"* use the rate of the "most nearly comparable class of construction worker" (*id.* at 417) after making an investigation of job differences and similarities. The case clearly requires the Commissioner to make careful job comparisons and sets forth the factors to be taken into account in making such comparisons.

That requirement is also explicit in both c. 121B, § 29, and c. 149, § 26. The statutory concepts of "prevailing wage" and the "wage rate ... established in certain trades and occupations" only have meaning in the context of evaluating similar jobs. Implicit in both statutes is the requirement that the Commissioner make careful job comparisons.

Since the Commissioner made no job comparison at all, either within or without the construction industry, he has not followed the statutory mandate. His characterization, without investigation, of all work not covered by a specific skilled trade within the construction industry as the work of a laborer, and then his setting of the wage in accordance with the collective bargaining agreement having the highest rate of pay for construction laborers is not the method prescribed. The judge found that the job of a construction industry laborer and a maintenance aide are not the same, and also that the jobs of the authority's CETA workers were not the same as those of the authority's regularly employed maintenance aides. These differences were not taken into account. Contrary to the Commissioner's contention, we believe the statutes require him to consider them.

The statutory history of c. 149, § 26, relating to laborers confirms this conclusion. A report of the Commissioner of Labor and Industries which discusses the bill where the language relating to laborers in municipal service first appears recognized that building construction laborers differed from common laborers and had different wage

rates. Thus, the wage set by towns would be an important determining factor in the wages paid to laborers on public works road contracts but would have no effect on building construction. 1933 Senate Doc. No. 300, at 15. The report also pointed out that not only were there "common laborers" and "building laborers," but that there were distinctions and different rates even within the category of common laborers. 1933 Senate Doc. No. 300, at 14. In setting rates, a bidder [9] would have to select, in a town having more than one wage paid to common laborers, "the particular rate paid to laborers whose work most closely *resembles* the kind of work which his own laborers ... perform." 1933 Senate Doc. No. 300, at 14 (emphasis supplied).

Under c. 149, § 26, the Commissioner in setting rates for public construction jobs would have no occasion to go outside the construction industry. Where rates are to be set for jobs under c. 121B, § 29, however, a meaningful comparison may require a reference to jobs outside that industry. This would be true where, after careful investigation, the Commissioner determines that there are no comparable or nearly comparable jobs in the construction industry.

We think the statutes authorize such additional reference. We note that only the last proviso of the pertinent portion of § 26 (note 6, *supra*) by its terms refers to "the construction industry"; the other provisos guiding the Commissioner do not. We also note that 1933 Senate Doc. No. 300, at 12 contained a chart of municipal rates for common laborers which would be relevant in setting wages. That chart was not limited to laborers engaged in construction and included the rates for common laborers in municipal "highway, sewer, forestry and water departments." Thus, neither the language nor the history of § 26 limits the job comparisons to laborers in the con-

[9] The original version of the statute provided for the bidder, rather than the Commissioner, to set the wage rate.

struction industry. Chapter 121B, § 29, certainly contains no such limitation. Many of the jobs in the development and administration of housing projects involve construction and alterations. For those jobs, it makes sense for public housing authorities to pay the same rates as are to be paid by municipalities and their contractors for public construction. However, where the jobs are unrelated to construction, it is inappropriate to require rigid comparison with construction jobs, and we do not think the statute requires such rigidity. We, therefore, construe the provisos in c. 149, § 26, which do not explicitly refer to the construction industry as authorizing the Commissioner in setting rates under c. 121B, § 29, to make comparisons with jobs outside that industry under those provisos.

We must also address the Commissioner's claim that § 26, which directs him to set rates at no lower than the wage rates "established" in certain trades and occupations by collective agreements, requires him to take the family of collective bargaining agreements and choose the highest amongst them. We do not agree that the rate "established" means the highest rate established by any agreement. A New Hampshire statute (N.H. Rev. Stat. Ann. c. 280, § 1, inserted by St. 1941, c. 118, § 1) containing an identical proviso relating to wages "established" as is contained in c. 149, § 26, was construed to mean a "prevailing wage" in *Union Sch. Dist.* v. *Commissioner of Labor*, 103 N.H. 512 (1961). Here, c. 121B, § 29, specifically requires the Commissioner to find the "prevailing wage." We hold that the proviso in § 26, at least when construed with c. 121B, § 29, refers the Commissioner to the prevailing wage established by collective bargaining agreements.

Although the term "prevailing wage" is not defined by statute, it is clear that its meaning as developed by case law is not equivalent to the highest wage. For example, in *Union Sch. Dist.* v. *Commissioner of Labor*, 103 N.H. at 516, the court said such a rate "has been generally defined as the market rate, the commonly paid rate, the

rate generally prevailing in the locality for similar services," and in *In re Sellers,* 13 App. Div. 2d 204, 207 (N.Y. 1961), the court said that "in order to be a prevailing wage, it must appear that at least a majority of workers in similar employment are receiving approximately that wage." A Pennsylvania court, in *Pennsylvania Dept. of Labor & Indus.* v. *Altemose Constr. Co.,* 28 Pa. Commw. Ct. 277, 286-287 (1977), said its common meaning was the "most frequent" or "generally current" wage. See also 29 C.F.R. § 1.2 (1978), where the "prevailing wage rate" is defined as the rate paid "to the majority of those employed." We note that a prevailing wage is not necessarily, or even usually, the highest rate.

A redetermination of rates by the Commissioner is necessary. See *Joplin* v. *Industrial Commn. of Missouri, 329 S.W. 2d 687, 695* (Mo. 1959). Chapters 121B, § 29, and 149, § 26, set forth standards for investigation and comparison to be followed by him before establishing those rates. As pointed out in *Union Sch. Dist.* v. *Commissioner of Labor,* 103 N.H. at 517, "[t]he task of acquiring information, working out the details and applying the rules and standards to specific cases has been conferred to the Labor Commissioner." The task calls for investigation and the exercise of discretion. It is not, as the Commissioner contends, a mere ministerial one. See 1933 Senate Doc. No. 300, at 15-25.

The judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*