UTILITY WORKERS OF AMERICA, LOCAL 466, vs. LABOR
RELATIONS COMMISSION.

Suffolk.   February 10, 1983. — June 16, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Labor Relations Commission. Administrative Law,* Proceedings before
agency. *Administrative Agency,* Interpretation of statute. *Labor,*
Unfair labor practice, Lockout, Strike by public employees.

A town which had not filed a petition with the Labor Relations Commis-
sion for an order directing the striking employees of its water and
sewer departments to return to work did not violate G. L. c. 150E,
§ 9A(*b*), by refusing to allow the employees to return to work until the
town could determine that its water and sewer services would not be
disrupted by further work stoppages or vandalism. [503-505]
A refusal by a public employer to permit employees to return to work
immediately at the end of a strike is not prohibited per se by any
language in G. L. c. 150E, § 9A. [505]
Substantial evidence in a proceeding before the Labor Relations Commis-
sion supported the commission's finding that a town had not engaged
in any prohibited practice within the meaning of G. L. c. 150E,
§ 10(*a*)(1) and (5), by refusing to allow employees of its water and
sewer departments to return to work immediately following a strike.
[505-507]

APPEAL from a decision of the Labor Relations Commis-
sion.

After review was sought in the Appeals Court, the
Supreme Judicial Court ordered direct appellate review on
its own initiative.

*Gabriel O. DuMont, Jr.,* for the plaintiff.
*John B. Cochran* for the defendant.

LYNCH, J.  The Utility Workers of America, Local 466
(union), appeals from a decision of the Labor Relations
Commission (commission).  On May 1, 1981, the union
filed charges with the commission alleging that the town of

Braintree (town) had engaged in prohibited practices within the meaning of G. L. c. 150E, § 10(a)(1), (3), (4), and (5), by locking out employees of the Braintree water and sewer departments. Following a preliminary investigation, the commission issued a complaint of prohibited practice alleging that the town had locked out[1] the employees in violation of § 10(a)(1) and (5).[2] After conducting formal hearings, however, the commission concluded that the town's action in response to a union work stoppage, which itself violated G. L. c. 150E, § 9A(a), was to preserve and protect public services. As such it was not prohibited by the plain language or necessary implication of § 9A(a), nor was it an act of bad faith bargaining in violation of § 10(a)(1) and (5). We took the case on our own motion. The commission dismissed the complaint. We affirm that decision.

The commission made the following findings of fact. At all times relevant to this case, the union represented workers in the waste disposal and water departments in the town. The most recent collective bargaining agreement between the town and the union had expired on June 30, 1980. At the time of the incident giving rise to this complaint, the parties had been negotiating for a successor agreement for approximately eighteen months. The town operates an incinerator at its waste disposal plant. On the night of April 28, 1981, all employees on the town incinerator's 11 P.M. shift called in sick. Employees who worked different shifts refused the town's request that they replace the absent workers for the eight hour shift. Consequently, manage-

---

[1] Both parties use the term "lock out" in referring to the employer's refusal to allow the employees to return to work immediately at the end of the strike. We take no position on whether that term properly applies to the employer's acts in this case.

[2] General Laws c. 150E, § 10(a)(1) and (5), inserted by St. 1973, c. 1078, § 2, read as follows: "(a) It shall be a prohibited practice for a public employer or its designated representative to: (1) Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter; . . . (5) Refuse to bargain collectively in good faith with the exclusive representative as required in section six."

The § 10(a)(3) and (4) charges were dismissed.

ment employees operated the incinerator during this time. Similarly, water department employees scheduled to work the midnight shift at the department called in sick and other workers refused to replace them. The water department is the sole provider of Braintree's water for industrial and domestic use and for fire protection. No viable alternative source of water existed.

The morning shifts in both departments also failed to report to work on April 29, 1981. Picket lines were established at both departments. Management personnel operated both facilities for the remainder of the day. Several incidents of vandalism occurred at the water department during the work stoppage. The commission found that the union's purpose for this work stoppage was to protest delays in the contract negotiations. The union does not dispute that this work stoppage violated G. L. c. 150E, § 9A(a).

On the morning of April 29, 1981, Edward Courchene, the general manager of the waste disposal department, called Charles M. Geilich, the town's consultant on the incinerator operations, and notified him of the work stoppage. Geilich then made arrangements with other waste processor plants to dispose of the refuse normally burned in the town. Geilich had to bind the town to use these alternative plants for at least one week in order to obtain access to them.

Also on the morning of April 29, Daniel F. Madden, the national representative of the union, arrived in Braintree. After being informed that the town's selectmen had decided on April 28, 1981, to make the union a new contract offer, Madden met with the employees at 3 P.M. At this meeting, the employees agreed to return to work for the night shifts that evening. Town officials were not informed of this meeting.

At approximately 6:15 P.M., Madden talked to William Ewing, the superintendent of the water department, and told him that "the strike was over" and that the midnight shift employees of the water department would report for work. At this point, the town officials were still unaware that the decision to return was made at a union meeting. The town officials discussed the situation and decided that

the men would not be allowed to return to work that evening. Joseph D. Cleggett, a Braintree selectman, testified that their decision was based on uncertainty as to whether the men would actually return to work and concern about the vandalism that had occurred at the water department.

During the evening of April 29, the union also informed the town officials that the incinerator employees would return to work on the 11 P.M. shift. In response to this information Cleggett polled the selectmen by telephone. The selectmen voted not to permit the employees to return until further notice. On April 30 and May 1, both departments were operated by management personnel. On May 1, the town suspended all the striking employees for one week because of their participation in the illegal work stoppage.

1. The town did not file a petition, referred to by the parties as a "strike petition," with the commission for an order directing the employees to stop striking under G. L. c. 150E, § 9A(b), at any time during the union's illegal work stoppage. General Laws c. 150E, § 9A(b), inserted by St. 1973, c. 1078, § 2, states: "Whenever a strike occurs or is about to occur, the employer shall petition the commission to make an investigation. If, after investigation, the commission determines that any provision of paragraph (a) of this section has been or is about to be violated, it shall immediately set requirements that must be complied with, including, but not limited to, instituting appropriate proceedings in the superior court for the county wherein such violation has occurred or is about to occur for enforcement of such requirements." The union contends that the word "shall" in the first sentence of § 9A(b) requires the employer to petition the commission and that the filing of this petition is the only action which a public employer is authorized to take when confronted with an illegal work stoppage by its employees. The commission has given the statutory provision a different reading. In construing the statute, the commission concluded that the provision requiring a public employer to file a strike petition does not establish the exclusive means by which a public employer

may respond to an illegal work stoppage. Rather, the commission interpreted the provision as creating a requirement that a public employer file a strike petition only as a prerequisite to obtaining administrative or judicial relief from violations by employees of § 9A(*a*).

As we have frequently stated, "The duty of statutory interpretation is for the courts." *Cleary* v. *Cardullo's Inc.,* 347 Mass. 337, 344 (1964). However, as we have also recognized: "[A]n administrative interpretation of a statute is accorded deference particularly where, as here, an agency must interpret a legislative policy which is only broadly set out in the governing statute." *School Comm. of Wellesley* v. *Labor Relations Comm'n,* 376 Mass. 112, 116 (1978), quoting *School Comm. of Springfield* v. *Board of Educ.,* 362 Mass. 417, 442 (1972). We think that the commission's interpretation here is correct. Nothing in the language of § 9A(*b*) suggests that by creating the petitioning process the Legislature intended to limit the means by which a public employer may respond to an illegal work stoppage. We do not read § 9A(*b*) to preclude a public employer from acting to protect essential public services when these services are threatened until it has petitioned the commission and the commission has set forth its requirements.

As the commission has noted, its procedures for resolving strikes necessarily involve some delay. By statute, the commission is directed to set requirements to correct any statutory violations *after* investigation. See *Director of the Div. of Employee Relations* v. *Labor Relations Comm'n,* 370 Mass. 162, 166 (1976). A certain amount of delay is therefore inevitable under the petition procedure. Strikes by public employees, though, may create exigent and unpredictable situations which require an immediate response by the public employer. While the Legislature has established a procedure by which administrative and judicial relief may be requested, we do not believe this deprives public employers of the flexibility to react to the particular situation, subject to the prohibited practice strictures of G. L. c. 150E, § 10. We agree with the commission that as

long as the public employer acts in good faith the employer must be permitted to take emergency actions to prevent public services from being disrupted. A contrary interpretation of the statutory language would severely limit the ability of the employer to protect and maintain important public services while waiting for the commission to complete its investigation. We reject a construction of the statute which would lead to such an irrational result. See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 355 (1973). Of course, where the employer acts without first petitioning the board, it runs the risk of a later determination that its actions were not taken in good faith. We conclude, however, that the commission was justified in deciding that the town did not violate § 9A(*b*) when, without filing a strike petition, it prevented its employees from returning to work until it could determine that its water and incinerator services would not be disrupted by further illegal work stoppages or vandalism.

2. The union next argues that lockouts are prohibited per se under G. L. c. 150E, § 9A. This argument is based on the theory that since the statute prohibits the primary economic weapon available to the union, the strike, the countervailing employer's weapon, the lockout, must also be prohibited. We reject this argument. The statute does not mention lockouts, much less prohibit them. Had the Legislature intended such statutory symmetry, a proscription of lockouts easily could have been included in the statutory language. The statute is clear and unambiguous on this point. We need proceed no further than the statutory language for its interpretation. See *New England Medical Center Hosp., Inc.* v. *Commissioner of Revenue*, 381 Mass. 748, 749-750 (1980). We conclude from the absence of such language that the Legislature did not intend a per se prohibition of lockouts.

3. The union next challenges the commission's finding that the town, by locking out the employees, did not violate G. L. c. 150E, § 10(*a*)(1) and (5). The union contends that the lockout was undertaken by the town to gain a prohib-

ited bargaining advantage and that the commission's conclusion to the contrary is not supported by substantial evidence. We disagree.

Substantial evidence is defined by G. L. c. 30A, § 1(6), as "such evidence as a reasonable mind might accept as adequate to support a conclusion." This standard "does not permit a court to treat the proceeding as a trial de novo on the record which was before the administrative board. A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo. *Universal Camera Corp.* v. *National Labor Relations Bd.*, 340 U.S. 474, 488 [1951]." *Southern Worcester County Regional Vocational School Dist.* v. *Labor Relations Comm'n*, 386 Mass. 414, 420 (1982), quoting *Labor Relations Comm'n* v. *University Hosp., Inc.*, 359 Mass. 516, 521 (1971).

In this case, formal hearings were held before a hearing officer on June 29, 1981, and August 13, 1981. Both parties had a full opportunity to be heard, to examine and cross-examine witnesses, and to submit evidence. Based on this record, the commission found that the town's actions did not constitute a violation of G. L. c. 150E, § 10(a)(1) and (5). In its decision, the commission stated that the union had failed to establish that the town's reasons for the lockout were merely pretexts. The union did not present any evidence that the town's action was motivated by a desire to improve its bargaining position with the employees or to punish the employees for their illegal work stoppage. On the contrary, the commission credited the town's explanation that its actions were based on a perceived need to preserve public services threatened by the work stoppage. The employees' job action was unexpected and the town was uncertain as to the reliability of the union leader's announcement that the employees would return to work. The commission also found that the town officials were justifiably concerned, on the basis of present and past experiences, about the possibility of further vandalism if the

employees were permitted to return to work before the situation was stabilized and the town was assured that the work stoppage would not be repeated. Additionally, immediately after being informed of the work stoppage, the town had decided to divert over fifty per cent of the refuse at the incinerator for a one-week period, obviating the need for most employees in that department. The commission found nothing in the record to impeach the town officials' testimony that they viewed the situation as volatile and reacted to the emergency based on valid economic and public safety considerations. The commission's findings are fully supported by the record. Accordingly, we find no error.

*Decision affirmed.*