RECEIVER OF THE BOSTON HOUSING AUTHORITY & another[1]
vs. COMMISSIONER OF LABOR AND INDUSTRIES & another[2]
(and a companion case[3]).

Suffolk.  March 7, 1985. — October 7, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Housing. Labor*, Wages. *Statute*, Construction. *Administrative Law*, Judicial review, Agency's interpretation of statute, Wage determination.

In setting wage rates under G. L. c. 121B, § 29, for employees of a city's housing authority, the Commissioner of Labor and Industries erred in concluding that, at least as to housing authority workers with counterparts in the construction industry, he was required by G. L. c. 149, § 26, to base housing authority wage rates solely on the wages set in collective bargaining agreements between unionized workers and the private construction industry. [54-57]

A party challenging the validity of wage rates for employees of a city's housing authority set by the Commissioner of Labor and Industries under G. L. c. 121B, § 29, and c. 149, § 26, is not required to demonstrate the absence of any conceivable ground on which a court might uphold the rates, but can prevail upon a showing that the method by which the commissioner arrived at the rates did not have a rational foundation. [57-59] LYNCH, J., concurring.

In an action by the housing authorities of Boston and Cambridge challenging wage rates for certain employees of the housing authorities set by the Commissioner of Labor and Industries under G. L. c. 121B, § 29, and c. 149, § 26, there were genuine issues of fact about the rationality of a study by the commissioner on which the wage rates were based and, consequently, it was error to order summary judgment in favor of the commissioner. [60-62]

CIVIL ACTIONS commenced in the Superior Court Department on April 9, 1982, and February 8, 1984, respectively.

[1] Cambridge Housing Authority, as intervener.

[2] Massachusetts Laborers' District Council, as intervener.

[3] Commonwealth *vs.* Boston Housing Authority.

The cases were heard by *Paul G. Garrity*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Paul F. Kelly* for Massachusetts Laborers' District Council, intervener.

*Jamie W. Katz*, Assistant Attorney General, for Commissioner of Labor and Industries & another.

*Terry Jean Seligmann* (*Lark L. J. Palermo, Peter Berry & James H. Wexler* with her) for Cambridge Housing Authority, intervener.

*Richard M. Bluestein* for Boston Housing Authority.

WILKINS, J.   The Commissioner of Labor and Industries (commissioner) set fiscal year 1983[4] wage rates for the Boston Housing Authority (BHA), pursuant to his authority under G. L. c. 121B, § 29, and G. L. c. 149, § 26. The BHA and the Cambridge Housing Authority (CHA) successfully challenged those rates in the Superior Court, which remanded the rates to the commissioner for redetermination. The commissioner redetermined the rates and then brought a separate action in the Superior Court to enforce them. That court consolidated the two cases, and, on motion of the commissioner, ordered summary judgment in his favor in the enforcement action. The BHA appeals from this judgment. The commissioner and the Massachusetts Laborers' District Council appeal from the Superior Court's original judgment remanding the rates for redetermination. We granted an application for direct appellate review. We hold that the judgment in the first action, remanding the rates to the commissioner for redetermination, was correct and should be affirmed. In the second action, we conclude that summary judgment should not have been entered in favor of the commissioner. Some rates must be determined once again because the commissioner failed to calculate them pursuant to standards prescribed by G. L. c. 149, § 26. As to the remaining rates, we remand the case to the Superior Court for further proceedings, because the BHA's challenge to the commissioner's method for assessing job comparability raised a disputed issue of material fact.

---

[4] Fiscal year 1983 began on April 1, 1982.

The essential facts are not in dispute. The BHA owns and operates over 18,000 apartments in sixty-seven housing developments, and employs approximately 350 workers to maintain them. The CHA owns and operates approximately 3,000 apartments in twenty-five housing developments, and employs seventy workers to maintain them. Both authorities are subject to collective bargaining agreements that set the wage rates for all maintenance employees at the levels determined by the commissioner under G. L. c. 121B, § 29.

In January, 1982, the BHA and the CHA requested the commissioner to set wage rates for fiscal year 1983.[5] The commissioner "mechanical[ly]" established wage rates for housing authority positions with counterparts in the construction industry (e.g., carpenters, electricians, plumbers, painters and laborers) at eighty per cent of the prevailing wage of similarly titled unionized workers in the construction industry. For housing authority positions with no construction industry analogue (e.g., appliance men, firemen, and auto mechanics), the commissioner set wage rates at eighty per cent of the prevailing wage for unionized construction industry laborers, plus various amounts.[6]

The BHA and the CHA complained that these rates were too high for the work performed by their employees and asked the commissioner to reconsider.[7] When he declined to reconsider, the BHA brought suit. The CHA intervened as a plaintiff, and the Massachusetts Laborers District Council intervened as

---

[5] General Laws c. 121B, § 29, as amended through St. 1978, c. 393, § 34, provides that the "commissioner shall determine rates of wages and fees . . . for each . . . classification [of employees] . . . ."

[6] For example, the wage of "appliancemen," who maintain and repair appliances in the BHA apartments, was set at eighty per cent of the prevailing wage for unionized construction industry laborers, plus fifteen cents per hour. The wage of "firemen," who maintain the BHA's heating systems, was set at eighty per cent of the same base rate, plus thirty-two cents per hour.

[7] As originally established, the wage rates were approximately twenty per cent higher than those set by the U.S. Department of Housing and Urban Development for maintenance workers performing similar tasks, and, in some cases, were approximately ninety per cent higher than wages paid to

a defendant. The housing authorities argued primarily that the work performed by their maintenance workers was not comparable to work performed in the construction industry, and that the commissioner was required to adjust the wage rates accordingly.

The Superior Court judge enjoined enforcement of the new rates on August 6, 1982.[8] On March 9, 1983, he held that the wage rates were arbitrary, and ordered the commissioner to redetermine them, finding that "the jobs performed by construction trade workers are vastly different from the jobs performed by the BHA['s] and the CHA's maintenance workers." The judge held that the Legislature intended the eighty per cent figure to be applied only to comparable positions, and that "in order to determine the comparability of certain work it is necessary to look beyond a job title or description and to the entire milieu of the work environment which includes such factors as hazards, difficulty of tasks, physical effort, job security, frequency of tasks, continuity, and all forms of compensation and other perquisites."[9]

municipal and university maintenance workers in Boston and Cambridge.

The following chart compares the dollar amounts of annnual wages initially set by the commissioner, effective April 1, 1982, with those of other maintenance workers:

|  | BHA | CHA | HUD |  |
|---|---|---|---|---|
| Plumber | 29,619 | 29,397 | 21,986 |  |
| Electrician | 29,411 | 30,147 | 21,986 |  |
| Carpenter | 24,232 | 25,542 | 20,966 |  |
| Laborer | 18,387 | 20,466 | 16,224 |  |

|  | CITY OF BOSTON | CITY OF CAMB. | BOSTON UNIV. | HARVARD |
|---|---|---|---|---|
| Plumber | 15,293 | 15,891 | 21,008 | 21,819 |
| Electrician | 16,026 | 19,074 | 21,008 | 21,819 |
| Carpenter | 15,293 | 15,891 | 20,509 | 21,029 |
| Laborer | - - - - - | 14,789 | - - - - - | 15,580 |

[8] The housing authorities were directed to pay the disputed increases into interest-bearing escrow accounts.

[9] On April 19, 1983, the judge enjoined enforcement of the wage rates for fiscal year 1984 (effective April 1, 1983), which were determined in the same manner as the original rates for fiscal year 1983.

The commissioner then conducted a job comparability study on which he based a new set of wage rates. For positions with analogues in the construction industry, the commissioner again based the new wage rates solely on collective bargaining agreements in the construction industry. For positions that had no analogues in the construction industry, the commissioner based the new wage rates on collective bargaining agreements outside the construction industry. The redetermined wage rates were issued in December, 1983, and, in most cases, were either the same or higher than the original rates. The Commonwealth brought suit thereafter to enforce the redetermined wage rates, and the judge granted its motion for summary judgment on August 17, 1984. The judge concluded that the wage rates were a "regulation," and thus that he was required to uphold them if they were supported by a rational basis. The judge ruled that, although there were some methodological shortcomings in the commissioner's job comparability study, it provided a sufficient rational basis for the determined wage rates.

1. The commissioner argues that, at least as to housing authority workers with counterparts in the construction industry, he is required under G. L. c. 121B, § 29, and G. L. c. 149, § 26, to base housing authority wage rates solely on the wages set in collective bargaining agreements between unionized workers and the private construction industry. The commissioner has misinterpreted the relevant provisions of G. L. c. 149, § 26, and has thereby ignored nonprivate and nonconstruction wage agreements on which the housing authority wage rates should be based.

General Laws c. 121B, § 29 (1984 ed.), provides that the commissioner shall set minimum wage rates for "architects, technical engineers, draftsmen, technicians, laborers and mechanics" employed by housing authorities, and that these wage rates shall be fixed "at no less than eighty per cent of the prevailing wage" as determined in accordance with G. L. c. 149, §§ 26 and 27. General Laws c. 149, § 26, which also governs generally the setting of wage rates for persons employed in the construction of public works, has four provisos

for determining those rates.[10] Interpreted in the context of this case, two are applicable.[11] In accordance with the third proviso, wage rates for any trade or occupation may not be less than eighty per cent of wage rates that have been established by collective bargaining agreements "between organized labor and employers" in the municipality where the housing authority is located. By the terms of the fourth proviso, when no such rates have been established in the municipality where the housing authority is located, the wage rates may not be less than eighty per cent of wage rates paid to employees engaged in the same trade or occupation by "private employers engaged in the construction industry."

The commissioner claims that, for housing authority positions with counterparts in the construction industry (i.e., carpenters, plumbers), the two statutes *require* that the "prevailing wage" be determined solely by reference to collective bargaining agreements in the private construction industry. This interpretation, however, contradicts the words of G. L. c. 149,

---

[10] In applicable part, G. L. c. 149, § 26, as amended through St. 1967, c. 296, §§ 2 and 3, states: "The rate per hour of the wages paid to said mechanics and apprentices, teamsters, chauffeurs and laborers in the construction of public works shall not be' less than the rate or rates of wages to be determined by the commissioner as hereinafter provided; provided, that the wages paid to laborers employed on said works shall not be less than those paid to laborers in the municipal service of the town or towns where said works are being constructed; provided, further, that where the same public work is to be constructed in two or more towns, the wages paid to laborers shall not be less than those paid to laborers in the municipal service of the town paying the highest rate; provided, further, that if, in any of the towns where the works are to be constructed, a wage rate or wage rates have been established in certain trades and occupations by collective agreements or understandings between organized labor and employers the rate or rates to be paid on said works shall not be less than the rates so established; provided, further, that in towns where no such rate or rates have been so established, the wages paid to mechanics and apprentices, teamsters, chauffeurs and laborers on public works, shall not be less than the wages paid to the employees in the same trades and occupations by private employers engaged in the construction industry."

[11] The first proviso in G. L. c. 149, § 26, may also be applicable to wage rate determinations under G. L. c. 121B, § 29, although it is not relevant here. By that proviso, wage rates for housing authority laborers may not be less than eighty per cent of wage rates for municipal service laborers in the municipality where the housing authority is located.

§ 26, because it combines elements of the third and fourth provisos. By the third proviso, the commissioner must first refer to collective bargaining agreements "between organized labor and *employers*" (emphasis supplied). Only when "no such . . . rates have been . . . established," is he to turn to the fourth proviso, where he is directed to consider wages paid *"by private employers engaged in the construction industry"* (emphasis supplied). These specific references in the fourth proviso show an intention that the generic word "employers" in the third proviso means something more than "private" employers or those "engaged in the construction industry." By the terms of the third proviso, the commissioner must consider first *all* employers — both public and private, and both within and without the construction industry — who have reached collective bargaining agreements with organized trades or occupations.[12]

In this case the commissioner improperly combined one element of the third proviso of c. 149, § 26, — "organized labor" — with one element of the fourth proviso — "private employers engaged in the construction industry" — to create a hybrid standard for wage rates that § 26 does not contemplate. The commissioner erred by looking to the fourth proviso, and, even if it were applicable, by not considering nonunionized workers.

The interpretation we adopt leads to no harmful or anomalous result. The wage rates of housing authority maintenance workers are still linked to rates paid unionized workers, if there are any in their locality, thus helping to ensure that they receive a reasonable wage. The commissioner must also consider wages paid to laborers by the municipality in which the workers are employed and, if the circumstances of the third proviso

---

[12] In *Commissioner of Labor & Indus.* v. *Boston Hous. Auth.*, 345 Mass. 406, 417 (1963), this court stated that "the commissioner . . . may reasonably use a rate of eighty per cent of the prevailing wage rate of the most nearly comparable class of construction worker." In that case, however, it was not the method, but the power, of the commissioner to set wage rates that was at issue. *Id.* at 413-414. In any event, the statement is an accurate application of the law when no sufficiently established rates exist in a particular community.

apply, by public and private employers outside the construction industry. The commissioner is then authorized to fix a wage rate not less than eighty per cent of the prevailing wage so determined. Some showing of comparability of jobs is implied in the statute. See *Commissioner of Labor & Indus.* v. *Boston Hous. Auth.*, 345 Mass. 406, 417 (1963). See also *Commissioner of Labor & Indus.* v. *Worcester Hous. Auth.*, 8 Mass. App. Ct. 303, 309 (1979). The commissioner may, in his sound discretion, set wage rates higher than eighty per cent to reflect genuine differences in the employment environment, such as the skills required, the hazards, and the responsibilities. He must, of course, consider fringe benefits in comparing prevailing wages.

The commissioner contends that we should defer to his interpretation of the statute. While judicial deference in general is certainly warranted, "[t]he duty of statutory interpretation is for the courts." *Utility Workers Local 466* v. *Labor Relations Comm'n*, 389 Mass. 500, 504 (1983), quoting *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 344 (1964). "In no event . . . will an administrative interpretation be followed if it is contrary to 'plain and unambiguous terms [in] a statute.'" *Saccone* v. *State Ethics Comm'n*, 395 Mass. 326, 335 n.12 (1985), quoting *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 441 n.22 (1972). We conclude, therefore, that all housing authority wage rates based on a "prevailing wage" in the construction industry must be remanded to the commissioner for redetermination consistent with this opinion.

2. In order to decide whether summary judgment for the commissioner was warranted as to positions for which there were no analogues in the construction industry, we must decide what standard of review should be applied when a housing authority challenges the rates determined by the commissioner. The motion judge applied the rational basis test applicable to the determination of the validity of a regulation (see, e.g., *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 736, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936 [1983]), and upheld the redetermined rates. Certainly the rates are not regulations

as defined in § 1 of the State Administrative Procedure Act
(G. L. c. 30A) because such a rate determination is not of
"general application" (G. L. c. 30A, § 1 [5]). *Associated
Indus.* v. *Commissioner of Ins.*, 356 Mass. 279, 284 (1969).
Nor is there a basis for treating the process as an adjudicatory
proceeding under G. L. c. 30A. The Legislature has declared
the process not to be an adjudicatory proceeding (G. L. c. 30A,
§ 1 [1] [*f*], inserted by St. 1966, c. 497, referring to the pred-
ecessor of G. L. c. 121B, § 29) and, in any event, there is no
statutory provision for a public hearing and no constitutional
right to a public hearing in favor of a housing authority. *Spence*
v. *Boston Edison Co.*, 390 Mass. 604, 607-610 (1983). See
*Trustees of Worcester State Hosp.* v. *The Governor*, 395 Mass.
377, 380 (1985).

We have no doubt that a housing authority properly may
challenge the commissioner's rate determination as being based
on an error of law. That is what the housing authorities have
done successfully in the first of these consolidated cases.
Beyond errors of law, a housing authority should have the
right to challenge the factual basis of a rate determination as
being arbitrary or capricious, that is, as lacking a rational basis.
See *Assessors of Sandwich* v. *Commissioner of Revenue*, 393
Mass. 580, 588 (1984); *Greenleaf Fin. Co.* v. *Small Loans
Regulatory Bd.*, 377 Mass. 282, 293 (1979). Unlike a challenge
to a regulation in which the court attributes any supporting
rational basis for the regulation to the regulation's author (see
*Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of
Cambridge*, 395 Mass. 535, 553-554 [1985]), a challenge to
a statutorily mandated determination of minimum rates cannot
be rejected simply by imagining circumstances that would be
supporting. The method by which the agency arrived at the
rates must have had a rational foundation. The commissioner's
supporting data and his calculations and conclusions should
not be upheld if they are illogical or irrational. The commis-
sioner need not have followed the best possible course in col-
lecting information and in arriving at the rates, but the resulting
rates must be logical in relation to the statutory standard. Here,
to succeeed, the housing authorities must ultimately demon-

strate that what the commissioner did in establishing the rates was not rational.

We reject the housing authorities' contention that the appropriate standard for judicial review of the commissioner's rates is the substantial evidence test. In this Commonwealth, the substantial evidence test involves a court's assessment of a record developed in a trial-type agency hearing. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466-467 (1981).[13] Any attempt to apply a substantial evidence test to a trial court record established after the commissioner has made his decision would overlook the deference courts should give to agency fact-finding and decision-making. The substantial evidence test has no meaning when one attempts to apply it to a record made in court rather than before an agency. A court may choose to impose a higher standard of review than the rational basis test. A court may require that any agency record of some sort be made and that the agency explain its decision. A court may even require a trial-type hearing be held in particular circumstances, even if no statute so prescribes. See *Massachusetts Medical Serv.* v. *Commissioner of Ins.*, 344 Mass. 335, 339 (1962). It is not feasible, however, to apply the traditional substantial evidence test, with appropriate deference to fact-finding of the administrative agency, to a factual record made in court.[14]

---

[13] Where an agency proceeding is prescribed by statute but is not governed by the State Administrative Procedure Act, review of agency factual determinations is based on whether the agency's findings have reasonable support in the evidence. See *Westland Hous. Corp.* v. *Commissioner of Ins.*, 352 Mass. 374, 385 (1967); *Insurance Co. of N. Am.* v. *Commissioner of Ins.*, 327 Mass. 745, 753 (1951). Cf. *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.*, 380 Mass. 919, 923-925 (1980) (action in nature of certiorari to review local licensing board's decision following agency hearing required by statute). Reasonable support in the evidence and the existence of substantial evidence in the record are essentially synonymous. *Workers' Compensation Rating & Inspection Bureau* v. *Commissioner of Ins.*, 391 Mass. 238, 244-245 (1984).

[14] In applying the "arbitrary and capricious" standard of the Federal Administrative Procedure Act (5 U.S.C. § 706 [2] [A] [1982]), the Federal courts review an agency record and expect to find a satisfactory explanation from an agency for its action. See *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Federal courts reviewing agency regulations or similar action consider an agency

3. We turn then to the question whether the summary judgment material before the motion judge presented a dispute of material fact concerning the existence of a rational or logical basis for the rates the commissioner established for positions not found in the construction industry. We conclude that the BHA raised sufficient doubt as to the rationality of the commissioner's method for setting wages as to bar summary judgment for the commissioner.[15]

In the comparability study the commissioner conducted following the remand order in the first case, he recognized that certain housing authority positions had no comparable counterparts in the construction industry, and, thus, he undertook to find nonconstruction industry collective bargaining agreements that could serve as bases for his wage determinations for these positions. Such an approach was consistent with his statutory duties. The housing authorities contend, however, that the commissioner's method for determining comparability was so deficient as to be irrational. They rely on an affidavit of an expert on job comparability that challenges the design, execution, and conclusions of the commissioner's study.

record and not a trial court record. See *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge*, 395 Mass. 535, 564 n.6 (1985) (Lynch, J., dissenting).

[15] Of course, as we have already held, see part 1, *supra*, all wage rates for positions with construction industry analogues must be remanded to the commissioner for redetermination consistent with the correct interpretation of G. L. c. 149, § 26. These positions are: bricklayers, cement masons, plasterers/tile setters, carpenters, electricians, painters, glaziers, plumbers, steam fitters, steam fitters/welders, and laborers. The wage rates for maintenance mechanic and maintenance aide were based solely on the prevailing wage for various construction industry positions and thus must be remanded to the commissioner as well. This portion of our opinion, therefore, concerns only those other positions without any counterpart in the construction industry, namely, appliance men, auto mechanics, high pressure and low pressure firemen, groundskeepers/custodians, and oil burner mechanics.

We may immediately dispense with the rates for oil burner mechanic. Although the motion judge found this position to be a nonconstruction trade, it is not included in the commissioner's own list of "classifications that were not comparable to those found in the construction industry." Indeed, the commissioner's study lacks any information concerning either the basis for the commissioner's finding of comparability or the collective bargaining agreement from which the prevailing wage was derived.

A finding of reasonable comparability is essential if the commissioner is to base a housing authority wage rate on a particular trade's or occupation's prevailing wage. We have already held that the third proviso of G. L. c. 149, § 26, requires that the commissioner investigate bargaining agreements both inside and outside the construction industry, and that he may at times be forced to look only at nonconstruction industry analogues. "The statutory concepts of 'prevailing wage' and the 'wage rate . . . established in certain trades and occupations' only have meaning in the context of evaluating similar jobs. Implicit in both statutes is the requirement that the Commissioner make careful job comparisons." *Commissioner of Labor & Indus.* v. *Worcester Hous. Auth.,* 8 Mass. App. Ct. 303, 309 (1979). See *Commissioner of Labor & Indus.* v. *Boston Hous. Auth.,* 345 Mass. 406, 417 (1963).

The commissioner argues that, even if comparability is required, his study establishes at least a rational foundation for concluding that the five positions still at issue are reasonably comparable to similarly titled trades and occupations outside the construction industry. The commissioner's survey instruments were derived from definitions contained in the Federal Dictionary of Occupational Titles (D.O.T.), and asked, in substance, whether each housing authority employee with a particular title performed the tasks set out in the D.O.T. definition. The commissioner concedes that this methodology may have emphasized similarities with similarly-titled trades, but he contends that an expanded, broader-based study would be "merely a sociological survey of work performed." The commissioner argues that the housing authorities' assertion of a dispute of material fact collapses simply to a difference of opinion on the proper scope of such a comparability study.

The housing authorities respond with criticisms of all facets of the comparability study. Three of their complaints seem of particular significance in the context of housing authority positions with no construction industry analogues. In the first place, the authorities argue that the study is irrationally biased in favor of finding comparability. They note that the formal part of the survey instrument catalogues only the ways in which a

housing authority position mimicked a particular trade; only a blank page, the responses from which were not collated, catalogued the ways in which a housing authority position and the trade in question differed. Since the questions on the formal survey instrument were always derived from the definition of the trade itself, the commissioner could scarcely fail to discover that, at least in some respects, overlap existed between the housing authority position and the similarly titled trade. Thus, the authorities argue, the commissioner's finding of comparability is meaningless.

Second, the authorities argue that, on two of the central concerns of the study — hazards and fringe benefits — the commissioner's methodology was explicitly biased. The commissioner openly stated that "[t]he purpose of th[e hazards] section [of the study] *was to establish that a comparable level of hazard existed* between the . . . trade and housing authority work" (emphasis supplied). The authorities contend that the commissioner asserted without any support that the vast array of employer-paid fringe benefits afforded housing authority personnel (but, ordinarily, not tradesmen) were approximately balanced by the twenty per cent differential between the prevailing wage and the wage rates set under G. L. c. 121B, § 29.

Finally, and perhaps most significantly, the authorities note that, even if the commissioner established comparability between a certain housing authority position and the abstract definition of a particular "trade" found in the D.O.T., the commissioner has not established — and the study does not purport to establish — comparability between the D.O.T. definition and the real-world trade from which the prevailing wage is derived. Without this latter comparison, the authorities argue, nothing can be said about the comparability of a housing authority position and a real-world trade or occupation.

In our opinion, these challenges raise genuine issues of fact about the rationality of the commissioner's study. On the basis of the record before us, we cannot say that the rates established have an unquestionably rational basis.

4. We affirm the judgment of the Superior Court in the first case. We reverse the summary judgment for the commissioner

in the second case, and remand that case for further proceedings consistent with this opinion.

*So ordered.*


LYNCH, J. (concurring). I applaud the court's conclusion that "[u]nlike a challenge to a regulation in which the court attributes any supporting rational basis for the regulation to the regulation's author, (see *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge,* 395 Mass. 535, 553-554 [1985]), a challenge to a statutorily mandated determination of minimum rates cannot be rejected simply by imagining circumstances that would be supporting," and that "[t]he commissioner's . . . calculations and conclusions should not be upheld if they are illogical or irrational." *Ante* at 58. I would, however, subject the commissioner's action to the test of reasonableness rather than rationality. This court and the parties agree that the wage rates are, strictly speaking, neither a regulation nor an adjudication. When an administrative action is neither an adjudication nor the promulgation of a regulation but consists of rate setting, "our task is to determine 'whether the commissioner has complied with the standards prescribed by the statute,' although 'we are not thereby authorized to substitute our judgment as to the reasonableness or adequacy of the [rates] for that of the commissioner.'" *Westland Hous. Corp.* v. *Commissioner of Ins.,* 352 Mass. 374, 384-385 (1967), quoting *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.,* 329 Mass. 265, 273 (1952). In other rate setting contexts we determine whether the rates have reasonable support in the evidence, *Westland Hous. Corp., supra* at 385. I would, therefore, hold that the BHA may attempt to show that the wage rates established by the commissioner have no reasonable support. In applying this standard, I would be mindful of the deference due the commissioner's specialized knowledge, technical competence, and experience regarding issues within the scope of his statutorily delegated authority. *Workers' Com-*

*pensation Rating & Inspection Bureau* v. *Commissioner of Ins.*, 391 Mass. 238, 246 (1984).

I am unsure if the reasonable support test I advocate would in this case compel a result any different from that adopted by the court. A test phrased in terms of reasonableness, however, would distinguish it from the traditional rational basis test which has been rejected in this case by the court and which I would abandon completely in the review of administrative decisions. See *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge*, 395 Mass. 535, 557-563 (1985) (Lynch, J., dissenting). Although I see no real difference between the concepts of rational basis as the court now defines it, and reasonable support, reasonable support, unlike rational basis, is a term that has resulted in meaningful judicial review in other cases. I would reject any suggestion that the concept of rationality, as opposed to reasonableness, results in any greater deference to the administrative determination being considered. Since we have recently attempted to eliminate confusion by pointing out that there is no essential difference between a duty to look for reasonable support in the evidence and a duty to look for substantial evidence in the record, *ante* at note 13, the reasonable support test would, I believe, further that desirable purpose. The reasonable support test I suggest requires a familiar mode of judicial review. Any such test requires an examination of the basis for the administrative determination. I would follow the suggestion of the court, that a reviewing court may require that a record be made by the agency and that it explain its decision, or that a trial-type hearing be held in appropriate circumstances. *Ante* at 59. I would not eliminate the possibility, however, as the court has done, that some circumstances might exist that would make it appropriate for a court to develop the record upon which an administrative action is based. If, as in this case, there is no procedure mandated by statute for the development of a record justifying the rates, and if a reviewing court should be satisfied that the agency charged with the responsibility has either failed or refuses to develop such a record, it seems to me appropriate for the Superior Court to do so.