LENOX EDUCATION ASSOCIATION *vs.* LABOR RELATIONS
COMMISSION.

Suffolk. May 8, 1984. — November 13, 1984.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Labor,* Strike by public employees. *School and School Committee,* Collective bargaining.

A concerted refusal ("work-to-rule" job action) by a school system's teachers to perform certain services customarily performed by them, but not expressly described in their collective bargaining agreement, or to perform any services which they had customarily performed after the end of their "workday," as defined in that agreement, would constitute a strike by public employees, within the meaning of G. L. c. 150E. [281-284]

A public employer may take disciplinary measures against employees who are engaged, or about to engage, in an unlawful strike disruptive of an essential public service, without first petitioning the Labor Relations Commission to make an investigation pursuant to G. L. c. 150E, § 9A (*b*). [284-286]

CIVIL ACTION commenced in the Superior Court Department on January 9, 1981.

The case was heard by *John L. Murphy, Jr.,* J., on a master's report.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Ann Clarke* for the plaintiff.

*John B. Cochran* for the defendant.

O'CONNOR, J. In this case we decide that the Labor Relations Commission (commission) correctly decided that a concerted refusal by public school teachers to perform services customarily performed by teachers generally, but not expressly described in their most recent collective bargaining agreement, or to perform any services after the end of the "work-day" as defined

in that agreement, would constitute a strike within the meaning of G. L. c. 150E. We also decide that a public employer may discipline, without the employer's first petitioning the commission to make an investigation pursuant to G. L. c. 150E, § 9A (b), employees who are engaged in or who are about to engage in an unlawful strike.

After the Lenox Education Association (association) filed a charge of prohibited practice, the commission issued a complaint alleging that the Lenox school committee had violated G. L. c. 150E, § 10 (a) (1), by threatening to discipline and by reprimanding certain teachers for engaging in a concerted "work-to-rule" job action. After an evidentiary hearing, a hearing officer concluded that a teacher who had drafted a letter, and a teacher who had sent to parents a letter, expressing the teachers' intention to cease certain practices, had a right to cease those practices, and that the drafting and sending of the letters was lawful concerted activity within the meaning of G. L. c. 150E, § 2. Consistent with that conclusion, the hearing officer found that the school committee, through the superintendent of schools, had violated G. L. c. 150E, § 10 (a) (1), by threatening to discipline and by reprimanding the teachers for engaging in that lawful activity. The hearing officer ordered the school committee to discontinue those practices, to remove all letters of reprimand which had been placed in the personnel file of one of the teachers, and to post a notice, furnished by the commission, stating that the commission had concluded that the school committee had engaged in certain specific prohibited practices.

The school committee appealed the hearing officer's decision to the full commission. The commission concluded that the teachers had a right not to perform *some* of the services to which reference had been made in their letters. To that extent the commission agreed with the hearing officer. However, the commission concluded that the teachers did not have a right to cease other services to which reference had been made. To that extent, the commission disagreed with the hearing officer. Because the commission thought the school committee had responded, in part, to lawful, protected conduct, the commis-

sion concluded that the school committee's action was unlawful. Therefore, the commission agreed with the hearing officer's decision that the school committee had violated G. L. c. 150E, § 10 (*a*) (1). The commission issued an order that in all significant respects was identical to the order that had been issued by the hearing officer. The association filed a complaint in the Superior Court pursuant to G. L. c. 30A, § 14, seeking judicial review of the commission's decision. The complaint appears to have been filed because of the association's concern about the commission's conclusion that concerted cessation by the teachers of some of the activities to which their letters referred would constitute a strike, and thus would not be protected activity for teachers to engage in to influence collective bargaining. A judge of the Superior Court adopted the recommendation of a special master that the commission's decision be affirmed. Judgment was entered accordingly. The association appealed, and we transferred the case here on our own motion.

It does not appear that the association was aggrieved in any way by the decision of the commission that the school committee had engaged in prohibited practices or by the order implementing that decision. The association does not claim that the commission granted it inadequate relief. As observed by the special master, "[p]aradoxically, it was the Association, whose grievance was substantiated by the Commission, which was the party which instituted this action to challenge the decision of the Commission." We would be justified in dismissing this appeal on the ground that the association lacks standing to bring it. However, we agree with the commission that "[t]his case raises significant issues concerning the limits of a lawful work-to-rule job action by public employees in Massachusetts." We think that the questions that have been orally argued and briefed by both parties are important, are likely to recur, and ought to be answered by this court. See *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 63-64 n.17 (1977); *Brunson* v. *Commonwealth*, 369 Mass. 106, 116 (1975); *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943).

We summarize the undisputed facts that were found by the hearing officer and adopted by the commission. The school committee and the association commenced bargaining in November, 1977, for a collective bargaining agreement to succeed the one expiring on August 31, 1978. When no agreement had been reached prior to the beginning of school in September, 1978, the association initiated a series of actions designed to apply pressure to the school committee. At first the association embarked on a very moderate "work-to-rule" job action, but on September 25, 1978, they decided to escalate it. Before the escalation the teachers had left school at the end of the "work-day," as the expired agreement defined that term, but they had corrected papers, prepared lessons, and performed other school-related work at home. After September 25, 1978, the "work-to-rule" called for performance of those activities only during the "work-day."

On September 29, shortly after the association adopted the escalated work-to-rule measures, Lenox school superintendent Roland M. Miller issued a memorandum advising all members of the faculty that failure to grade papers promptly or to perform traditional services would constitute a violation of G. L. c. 150E, § 9A (*a*). As superintendent, he wrote, he "would have to take appropriate action, however distasteful that may be." On September 27, teacher Bonnie Carnevale, who was also secretary of the association, had drafted a letter to her students' parents. The letter explained how the "work-to-rule" action would affect her teaching activities. The letter said that Carnevale would not work on school-related activities after 3:15 P.M., that she would cease sending home weekly evaluations, that she would cease publication of a monthly newsletter to parents, and that she would be available to meet with parents only during her planning period. The weekly evaluations and monthly newsletter were unique to Carnevale's class; that is, they were not in general use by Lenox teachers. However, it was general practice for teachers in Lenox to meet with parents during times other than the planning period, and to perform school-related activities such as correcting papers and preparing lessons after the end of the school day, either at school or at home.

Carnevale never sent that letter to the students' parents, but she did distribute it to various teachers and it was posted on a bulletin board. The commission found that this constituted concerted activity. A copy reached the school principal and Miller, and they promptly visited Carnevale in her classroom. Miller insisted that Carnevale was obliged to continue all activities that she had customarily performed. In a letter to Carnevale, Miller confirmed that she was expected to provide whatever services she had provided in the past, specifically those services she had identified in her letter. Sometime later, Miller and the principal decided that Carnevale was not required to prepare her newsletter, and she was so informed.

On October 4, 1978, Donna Donovan, a Lenox teacher and the association's president, sent a letter to her students' parents describing the impact of work-to-rule on her teaching activities. That letter, also found to have been concerted activity, stated that only during free periods such as lunch and recess would Donovan correct papers, meet with parents, and deal with students' special problems. It also stated that the coffee hour that Donovan had planned for the parents would be postponed, and that Donovan might not be able to make complete comments on students' work in the take-home folders she prepared twice a month. Of these activities, only the coffee hour and the take-home folders were unique to Donovan. Miller and the principal confronted Donovan much as they had confronted Carnevale. In response to questioning, Donovan told Miller and the principal that, if a parental conference could not be held during a free period and if it were serious enough, she would accommodate a parent who requested an after-school conference.

On October 12, 1978, an advertisement sponsored by the association appeared in a local newspaper. It stated, in part, that the association wanted to clarify what "working to rule" meant. The advertisement then stated that "[i]t means that the traditional work of the teacher, that is, correcting papers, planning lessons, conferring with parents, recording grades, etc. will be done during the confines of the school day."

On October 12 or 13, Miller issued to all faculty members a memorandum which, in material part, notified them that correspondence to parents "is not to substantially indicate that you are or that you anticipate the withholding of any services contrary to the law." On October 13, Miller sent a letter of reprimand to Donovan. The letter cited possible insubordination with respect to his September 29 memorandum and cited as conduct unbecoming a teacher, Donovan's letter to parents. Miller's letter stated that the reprimand would be placed in Donovan's personnel file unless she wrote to the parents another letter making it clear that she would accommodate parents who requested after-school meetings, that she would assist children with individual problems as she had customarily done, not just at recess, and that she would provide written comments on take-home folders "to the same extent as in the past." Donovan did not write the second letter.

We set forth relevant portions of the applicable law. General Laws c. 150E, § 1, defines the word "strike" as "a public employee's refusal, in concerted action with others, to report for duty, or his wilful absence from his position, or his stoppage of work, or his abstinence in whole or in part from the performance of the duties of employment as established by an existing collective bargaining agreement or in a collective bargaining agreement expiring immediately preceding the alleged strike, or in the absence of any such agreement, by written personnel policies in effect at least one year prior to the alleged strike." St. 1973, c. 1078, § 2. General Laws c. 150E, § 9A (*a*), inserted by St. 1973, c. 1078, § 2, provides that "[n]o public employee or employee organization shall engage in a strike, and no public employee or employee organization shall induce, encourage or condone any strike, work stoppage, slowdown or withholding of services by such public employees."

General Laws c. 150E, §§ 2 and 10, protect concerted employee activity for the purpose of influencing collective bargaining so long as that activity does not violate G. L. c. 150E, § 9A (*a*). Section 2 provides that "[e]mployees shall have the right of self-organization and the right to form, join, or assist any employee organization for the purpose of bargaining collectively through representatives of their own choosing on

questions of wages, hours, and other terms and conditions of employment, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion." St. 1973, c. 1078, § 2. Section 10 (*a*) (1) makes it a prohibited practice for a public employer to "[i]nterfere, restrain, or coerce any employee in the exercise of any right guaranteed under [c. 150E]." St. 1973, c. 1078, § 2.

The hearing officer and the full commission agreed that the teachers had a right to engage in a concerted cessation of activities that were not required by their most recently expired collective bargaining agreement. They agreed also that Carnevale's weekly evaluations and monthly newsletter, and Donovan's coffee hour and take-home folders were not required by that agreement. The commission's reason for that conclusion was that those services were not traditional activities engaged in by the Lenox teachers generally but were unique to Carnevale and Donovan, and voluntary on their part. The hearing officer and the commission concluded, as do we, that discontinuance of those activities by the teachers and their letters in that regard, were protected by c. 150E, §§ 2 and 10. Therefore, the school committee's actions disciplining and reprimanding the teachers and threatening disciplinary actions were prohibited practices.

The hearing officer and the commission parted company over whether the letters written by Carnevale and Donovan were lawful, and therefore protected, to the extent that they announced the teachers' intentions not to perform services such as correcting papers and meeting with parents or children except during the "work-day" as that term was defined in the collective bargaining agreement. Contrary to the decision of the hearing officer, the commission concluded that a concerted refusal by the teachers to perform tasks that were customarily and traditionally performed after school hours by Lenox teachers as a group would constitute a strike justifying disciplinary measures. We agree with the commission.

"[A]bstinence in whole or in part from the performance of the duties of employment as established by an existing collective bargaining agreement or in a collective bargaining agree-

ment expiring immediately preceding the alleged strike, or in the absence of any such agreement, by written personnel policies in effect at least one year prior to the alleged strike," constitutes a strike. G. L. c. 150E, § 1. The association argues that the "duties of employment" to which the statute refers are only those duties expressly stated in writing in a collective bargaining agreement or in personnel policies. We agree with the commission that the duties referred to may be implied in such a document as well as expressed. A collective bargaining agreement cannot specify all the duties of employment. As stated by the commission, "[t]he contract may nowhere say that a teacher shall teach, that a fire fighter shall fight fires. Nevertheless, some duties are so essential to the very nature of the job as to require no explication. Others are necessarily implied in the collective bargaining agreement under which the employees work." "There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community . . . to fifteen or even fifty pages. Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement." *United Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579-580 (1960), quoting Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1498-1499 (1959). We conclude, therefore, that unless they are expressly excluded, a collective bargaining agreement impliedly includes past practices of the employee group as duties of employment.

The association contends that Article IV (A)(2), (4) and (5) of their most recent collective bargaining agreement expressly excludes from the duties of employment the performance of work after the time prescribed in that article. Article IV (A)(2) provides that "[t]he work-day of elementary classroom teachers [Carnevale and Donovan were elementary classroom teachers] will begin thirty minutes before the starting time for students and . . . will end after all busses and children have left the school

area, except those teachers who are required by the head teacher to remain for after school help sessions with children requesting them or for other routine after school meetings or the like." The other sections of Article IV (A) relied on by the association specify certain periodic after-school meetings the teachers are required to attend. The teachers argue that those provisions provide by negative implication that the teachers are not required to work after the school buses and children have left the school except as specified. We think, though, that the provisions relied on by the association were designed only to set the time limits for the teachers' physical presence at the school and were not intended to restrict the performance of school-related activities to those times.

The commission found that the Lenox teachers as a group had traditionally corrected papers and assisted parents and children after school hours. Therefore, concerted refusal to engage in those activities after the close of the "work-day," or the announcement of an intention to refuse to do so, were not permissible nor protected practices under G. L. c. 150E, §§ 2 and 10 (a) (1). Further, the threat or imposition of discipline by the school committee was not prohibited unless we accept the association's argument, discussed below, that such discipline was prohibited by the school committee's failure to resort to the petition procedure provided by G. L. c. 150E, § 9A (b).

General Laws c. 150E, § 9A (b), inserted by St. 1973, c. 1078, § 2, provides that "[w]henever a strike occurs or is about to occur the employer shall petition the commission to make an investigation. If, after investigation, the commission determines that any provision of paragraph (a) of this section has been or is about to be violated, it shall immediately set requirements that must be complied with, including, but not limited to, instituting appropriate proceedings in the superior court for the county wherein such violation has occurred or is about to occur for enforcement of such requirements." The association argues that the word "shall" is mandatory, and therefore, except in a critical emergency, not present here, a public employer's response to a strike or threatened strike is limited in the first instance to a petition to the commission to

investigate. It is argued that even if Carnevale's and Donovan's actions were not themselves protected under G. L. c. 150E, § 10 (*a*) (1), that section was nevertheless violated by the school committee's applying and threatening discipline before a determination was made by the commission under § 9A (*b*).

Our holding in *Utility Workers, Local 466* v. *Labor Relations Comm'n*, 389 Mass. 500 (1983), defeats the association's argument. In that case we held that, even though the town of Braintree had not petitioned the commission under § 9A (*b*), it did not violate that section when it refused to allow employees of its water and sewer departments to return to work after they had engaged in an illegal strike. The union in that case made precisely the argument made here by the association. The commission concluded in that case that under § 9A (*b*), a public employer has discretion whether to file a petition; that it must do so only if it wishes to obtain administrative or judicial relief from employee violations of § 9A (*a*). *Id.* at 503-504. We held that the commission's interpretation of § 9A (*b*) was correct. "Nothing in the language of § 9A (*b*) suggests that by creating the petitioning process the Legislature intended to limit the means by which a public employer may respond to an illegal work stoppage." *Id.* at 504. Recognizing the inevitability of a certain amount of delay while the commission investigated in response to a strike petition, and the necessity for important public services to continue in the interim, we "[did] not read § 9A (*b*) to preclude a public employer from acting to protect essential public services when these services are threatened until it has petitioned the commission and the commission has set forth its requirements." *Id.* at 504-505. We adhere to that construction of the statute.

The association would have us limit the holding in *Utility Workers, Local 466* v. *Labor Relations Comm'n, supra,* to the type of emergency situation present there; a threatened disruption of water supply and sanitary services. We are unwilling to do so. Our reasoning in that case applies to the disruption of any essential public service, including public education. Of course, although it is lawful for a public employer to resort to self-help without first filing a strike petition when an employee

strike occurs or is threatened, the employer's conduct must not otherwise violate the prohibitions of G. L. c. 150E, § 10 (*a*) (1).

*Judgment affirmed.*