SCHOOL COMMITTEE OF LEOMINSTER *vs.* LABOR RELATIONS
COMMISSION & another.[1]

Suffolk.   October 17, 1985. — December 17, 1985.

Present: DREBEN, CUTTER, & FINE, JJ.

*Labor Relations Commission. Labor,* Unfair labor practice, Strike by public
employees. *Public Employment,* Strike. *Law of the Case.*

On a complaint by a teacher's union charging that action by a school
committee in requiring certain teachers, who had been absent on two
days during which almost one fourth of all teachers had called in sick,
to produce certificates from physicians constituted a prohibited unilateral
change in a collective bargaining agreement, as well as past practice,
which had been to require such a certificate only after an absence of
five days, the Labor Relations Commission was not required to make
an explicit finding that a strike or illegal work stoppage had taken place
to support its conclusion that no prohibited practice had been committed,
where the commission had found that in the circumstances of the case
the committee's requirement of a physician's certificate from absentees
was reasonable. [251]

On appeal from a decision and order of the Labor Relations Commission
consistent with a judgment of the Superior Court that had reversed an
earlier decision and order of the commission, this court declined to treat
the judgment as establishing the law of the case, set aside the decision
and order appealed from, and ordered the commission's original decision
and order to be reinstated. [251-253]

APPEAL from an order of the Labor Relations Commission.

*Gregory J. Angelini* for the plaintiff.

*Jean Strauten Driscoll* for the defendant.

*Americo A. Salini, Jr.,* for the intervener.

CUTTER, J. This controversy arises out of events in 1978
and 1979, but has not been disposed of because of procedural
delays. The 1978 and subsequent events may be summarized
as follows.

---

[1] Leominster Education Association, which intervened on appeal.

A collective bargaining agreement between the Leominster school committee (the Committee) and Leominster Education Association (LEA), the bargaining agent for the city's school teachers, expired on August 31, 1978. Negotiations for a new agreement had reached an impasse by the late summer of 1978. On a carry-over basis, however, the provisions of the old agreement continued in effect through February, 1979, including the sick-leave provision (art. XIV, see note 6, *infra,* and related text). Indeed, the next later agreement continued art. XIV in effect without material change.

The secretary of the Committee, on November 16, 1978, wrote to the presidents of LEA and the Massachusetts Teachers Association (MTA) reciting that the Committee had learned from reliable sources that teachers and LEA were "contemplating a . . . 'sick-out' " on November 22, 1978. The letters each called attention to G. L. c. 150E, § 9A,[2] prohibiting strikes by public employees and providing a method for application to the Massachusetts Labor Relations Commission (the Commission) for a prompt investigation. These letters requested assurances from LEA and MTA that they, respectively, were not contemplating activities prohibited by § 9A (*a*) and stated that the Committee (1) would ask the Commission for an investigation of any work stoppage, (2) would require a physician's statement from any employee absent from school, (3) would pay no compensation "for . . . [any] day missed, in appropriate cases," and (4) would take other appropriate disciplinary action. In November, 1978, however, no work stoppage took place.

---

[2] Section 9A, as inserted by St. 1973, c. 1078, § 2, reads (emphasis supplied): "(*a*) No *public employee* or employee organization shall engage in a strike, and no public employee or employee organization shall induce, encourage or condone any strike, *work stoppage,* slowdown or *withholding of services* by such public employees. (*b*) Whenever *a strike occurs or is about to occur,* the employer shall petition the commission to make an investigation. If, after investigation, the commission determines that any provision of paragraph (*a*) of this section has been or is about to be violated, it shall immediately set requirements that must be complied with, including, but not limited to, instituting appropriate proceedings in the superior court for the county wherein such violation has occurred or is about to occur for enforcement of such requirements."

On February 15 and 16, 1979, ninety-five of the 400 class-room teachers employed by the Committee called in sick on at least one of these two days in circumstances more fully set out in note 7, *infra*. When faced with this situation on February 15, 1979, Leominster's superintendent of schools (the Superintendent) then distributed to each teacher on that day a memorandum which in part is reproduced in the margin.[3] The Committee on February 15, 1979, also filed with the Commission a request for an investigation under § 9A (*b*), see note 2, *supra*. One was conducted on February 23, 1979.

On that day, the Commission issued a "Notice to the Parties" which declined to determine that LEA (as a union) had violated § 9A (*a*), but did conclude that "a number of individual employees may have participated in a strike or induced [or] encouraged . . . a strike." Because the Committee's petition had not named the specific individuals who participated in illegal activities, and because those who had done so had been afforded no opportunity to defend against any charges, the Commission granted permission to the Committee to amend its petition, if it wished to to do so, "to name specific individuals who may have participated in" or assisted a work stoppage. The Committee did not amend its petition.[4] No further proceedings were held by the Commission on the Committee's petition under § 9A (*b*) for an investigation.

---

[3] The letter, an effort at "self-help" because of an apparent "work stoppage," read: "The School Committee has reason to believe that the Leominister Teachers and the LEA are participating in a scheduled 'sick-out' which began on February 15, 1979. . . . [The letter then referred to § 9A, see note 2, *supra*.] Unless this action ceases immediately, the . . . Committee shall take the following actions: (1) The School Committee shall notify the Labor Relations Commission of the threat of a work stoppage, and . . . the . . . committee expects that . . . the . . . Commission will immediately investigate . . ., issue orders to the teachers, and obtain a Court injunction if necessary. (2) We may require verified physician's statements for all employees who are absent from school. (3) No compensation shall be paid for the day missed, in appropriate cases . . . . (4) The . . . Committee shall take appropriate disciplinary action which may result in the suspension and termination of teachers."

[4] We perceive nothing which required the Commission, on a § 9A investigation, to be informed of the names of all the individual participants in

February 16 was a Friday. The following week was a vacation week. On February 27, 1979, the Superintendent sent a memorandum to most (but not all) of the teachers who were absent on February 15 or 16, 1979, stating that the Committee on February 26 had voted to require a doctor's certificate from such absentees, and that such absentees "who do not present such a proof of illness" would be "docked one day's pay." See G.L. c. 150E, § 15.[5] Thereafter, on March 1, 1979, LEA filed a "charge of prohibited practice" because of the requirement of a doctor's certificate from the absentees. The charge asserted that the requirement was "a unilateral change [by the Committee] and contrary to the [existing] collective bargaining agreement [on sick leave] and past practice." LEA contended that there was "no proof that there was a strike as defined in . . . § 9A and [that] as a result" § 15 was not applicable.

As already stated, the "carry-over" collective bargaining agreement contained a provision (art. XIV B) with respect to "Sick Leave" that, "[a]fter five (5) days of absence, the Committee shall have the right to require a doctor's certificate as proof of illness."[6] The Committee, for an absence of less than five days, had not required such a certificate prior to the events of February, 1979.

what appeared to be a "wildcat" work stoppage, but perhaps it was not intended that all participants be named. Indeed, in such a work stoppage involving a large number of public employees, any requirement that the names of all or substantially all individual participants be furnished might be unreasonably cumbersome and delay quick resumption of an important public service.

[5] General Laws c. 150E, § 15, inserted by St. 1973, c. 1078, § 2, included a provision reading: "No compensation shall be paid by an employer to an employee with respect to any day or part thereof when such employee is engaged in a strike against said employer, nor shall such employee be eligible to recover such compensation at a later date in the event that such employee is required to work additional days to fulfill the provisions of [a] collective bargaining agreement."

[6] The purpose of this provision appears to have been to allow, as a matter of trust of the teachers, a few days of absence for genuine illness, and to avoid, for school officials and teachers alike, the administrative inconvenience and expense of physician's certificates for short, routine, genuine illness-caused absences. Such certificates were required, however, for longer

On May 1, 1979, after considering LEA's charge, the Commission issued a "complaint of prohibited practice" under G. L. c. 150E, § 10(*a*) (5) and (1). On the basis of the Commission's recitation of the then past history of the constroversy, which does not appear to be controverted in relevant respects, many of the facts outlined above have been set forth.

The Commission (then composed of Chairman Cooper and Commissioners Wooters and Dolan) issued its decision on November 13, 1979. It made findings essentially consistent with the circumstances already stated above.[7] Also, the Commission concluded that the Committee's requirement of physician's certificates from the February absentee teachers was reasonable in view of the strong statutory policy of c. 150E, § 9A (*a*). The commission's language is set out in full in the margin.[8] The Commission then, on November 13, 1979, dismissed its own complaint of May 1, 1979, against the Committee.

---

lasting situations. Nothing in this record suggests that art. XIV B was intended to afford teachers an opportunity for coordinated "sick-leave" absenteeism for less than five days, not really caused by illness, which could not be checked by school officials. Article XIV B, if so interpreted, would be clearly contrary to the public policy set out in G. L. c. 150E, §§ 9A and 15 (see notes 2 and 5, *supra*).

[7] As to the work stoppage on February 15 and 16, 1979, the Commission found that "approximately 95 of the 400 classroom teachers . . . called in sick," and that at one school "[o]n February 15, all 15 teachers were absent" and at another school, nineteen were absent. "Most of the teachers who were absent on February 15th were present on February 16th and vice versa." It also found, among other matters, (a) that the Superintendent's memorandum of February 27 was sent to teachers in seven of thirteen schools in the city "even though teachers were absent from other schools during the days in question"; (b) that the Committee offered LEA no opportunity to bargain over the requirement of a doctor's certificate justifying an absence on February 15 or 16; and (c) that about sixty "teachers who failed to produce adequate excuses for their absences on February 15 or 16 were docked one day of pay."

[8] "We find circumstances in this case which justify what in other cases would be an unlawful unilateral change in sick leave policy. In this case the requirement that teachers who called in sick be required to produce physicians' statements is reasonable *in view of the statutory policy against public employee strikes* as enunciated in Section 9A (a) [see note 2, *supra*] . . . and the need, in light of Section 15 [see note 5, *supra*], to permit a

The LEA appealed to the Superior Court on December 7, 1979, for judicial review (then governed by G. L. c. 150E, § 11, fourth par., as in effect prior to the transfer by St. 1981, c. 351, § 245, to this court of the duty of reviewing Commission actions). Before the Superior Court the Committee seems to have taken no direct part. It apparently relied upon the Commission's attorneys to uphold the Commission's 1979 decision. The proceedings in the Superior Court ended on July 11, 1983, when a judgment was entered directing that the Commission's decision of November 13, 1979, be "reversed and set aside as set out . . . in the transcript attached" to the judgment "and incorporated therein." The matter was remanded to the Commission "for proceedings not inconsistent with this judgment." That transcript is confusing but the judge's conclusion was that the Committee's action had been "beyond its power because it unilaterally abrogated the carryover provisions of the collective bargaining agreement . . . in the absence of an *explicit finding* by the . . . Commission that there was a strike . . . or a sickout" (emphasis supplied). The Superior Court docket indicates that no appeal (even if claimed) from the judgment of reversal was ever prosecuted.

After remand, the Commission (by two members, Chairman Edgar and Commissioner Walsh, neither of whom had participated in the Commission's 1979 decision) on January 30, 1985, entered a new decision, which varied materially from the decisive language in the 1979 decision (quoted in note 8, *supra*). The new 1985 decision started afresh, reviewed the procedural history of the case at some length, made (apparently on the basis of evidence before the Commission in 1979) a new summary of facts deemed relevant, and rendered a new opinion, which concluded that the Committee had violated §§ 10(*a*) (5) and (1) of G. L. c. 150E "by unilaterally implementing a change in sick leave policy." It directed new relief designed

logical and fair way of enforcing the [l]aw. In this case teachers knew since November, 1978, that the . . . Committee might require physicians' excuses if it believed a 'sick-out' occurred. Further, the Superintendent was flexible as to the form of excuse ultimately accepted from teachers who called in sick." (Emphasis supplied.)

"to restore the status quo and to make affected employees whole." From the Commission's 1985 decision, the Committee has appealed to this court under the provisions of G. L. c. 150E, § 11, as amended by St. 1981, c. 351, § 245. See now St. 1985, c. 330, § 1.

1. We hold that the Superior Court judge's 1983 reversal of the Commission's 1979 decision was in error. The 1979 Commission was not required by G. L. c. 150E, § 11, as it read in 1979,[9] to make an explicit finding that a strike or illegal work stoppage had taken place. Its conclusion (quoted in note 8, *supra*) that "circumstances in this case . . . justify" what had been done by the Committee, and that its requirement of a physician's certificate from absentees was "reasonable" was sufficient indication that "prohibited practice ha[d] not been . . . committed" (see n. 9). The 1979 Commission's language, viewed in its entirety (upon ample evidence and subsidiary findings), in effect treated the events of February 15 and 16, 1979, as a "wildcat" work stoppage by individual teachers (not shown to have been fomented or condoned by LEA) in violation of the strong public policy against strikes and work stoppages by public employees. See G. L. c. 150E, § 9A, note 2, *supra*. The Superior Court judge, by his reversal of the Commission's 1979 decision (accompanied by a highly ambiguous transcript), failed to recognize the significance of the quoted language in relation to the Commission's 1979 decision as a whole.

Understandably, the Commission in 1985 may have been misled by the judge's action. It also may have felt constrained by his action to reach a new and different conclusion. This court, however, as an appellate court, is not compelled to treat the earlier erroneous decision of the Superior Court judge in the same cause as binding us (as the "law of the case" or otherwise). This is so even if no appeal was taken to this court from that decision. "[I]f we are satisfied that a previous holding in the same case was in error, we have not only the right, but

---

[9] The pertinent language of § 11, then read (as amended through St. 1977, c. 788), "If, upon all of the testimony, the commission determines that a prohibited practice has not been or is not being committed, it shall state its findings of fact and shall issue an order dismissing the complaint."

sometimes the duty, to make correction." *Gleason* v. *Hardware Mut. Cas. Co.,* 331 Mass. 703, 710 (1954), where there is ample citation of pertinent authority. That such a power exists (even as to an earlier decision of the same appellate court) has been recognized as recently as *New England Merchs. Natl. Bank* v. *Old Colony Trust Co.,* 385 Mass. 24, 26 (1982, although in that case, the power was not exercised, because the court was "satisfied with . . . [its] previous ruling"). See *Rager* v. *McCloskey,* 305 N.Y. 75, 78 (1953). See also *Relph* v. *Board of Educ. of DePue Unit Sch. Dist. No. 103,* 84 Ill. 2d 436, 442 (1981, where it was said that, on "the first time . . . [a case has] been before" an appellate court, that court's "review may cover all matters properly raised and passed on in the course of [the] litigation").[10]

In the *Gleason* case, 331 Mass. at 710, it was recognized that the rule of that case represents a somewhat infrequent variation from "the practice of courts generally to refuse to reopen what has been decided" but that such a variation was applied there, because to do otherwise would "lead to injustice." So far as correcting the Superior Court judge's error now may involve a matter of discretion, we think that various considerations require it: (1) The reversal of the 1979 Commission decision has obviously resulted in a misleading precedent. (2) The Commission in 1985, in attempting to meet the reversal remand by changing the 1979 result, has wrongly decided that "[t]he evidence presented in this case is insufficient to find that a strike occurred or was about to occur" on either February 15 or 16, 1979.[11] (3) The effect of judicial decisions since

[10] For other authorities, see *Commonwealth* v. *Ackers,* 343 Mass. 63, 68 (1961); *Sjostrom* v. *Sproule,* 33 Ill. 2d 40, 41 (1965), 18 Wright & Miller, Federal Practice and Procedure § 4478 (1981 & Supp. 1985); 1B Moore's Federal Practice par. 0.404 (2d ed. 1984 & Supp. 1984-85). See also *United States* v. *Fernandez,* 506 F.2d 1200, 1203-1204 (2d Cir. 1974); *Russell* v. *Commissioner,* 678 F.2d 782, 784-785 (9th Cir. 1982). The recent case of *Loring* v. *Marshall,* 396 Mass. 166, 172-173, 184 (1985), dealt with the effect of a prior decision of the same court, nearly a quarter of a century earlier under the same instrument, which during the interval had been regarded as final.

[11] This alone would require reversal of the 1985 Commission decision. The unusually large absenteeism on both February 15 and 16, 1985, taken

1979 has been disregarded in consequence of the error.[12] (4) Considerations of efficient court administration support correcting now the erroneous reversal of the Commission's 1979 decision.[13] In view of these considerations, we do not treat the erroneous 1983 reversal as establishing the law of this case and proceed now to correct that reversal.[14]

2. For reasons already stated, we set aside the 1985 decision and order of the Commission and direct that the Commission's original 1979 decision (in effect that the Committee's actions in February, 1979, were reasonable) be reinstated.

*So ordered.*

---

with (1) the sudden recovery from sickness by February 16 of the teachers absent on the 15th, and (2) the sudden "illness" of the other teachers on the 16th, who had been present on the 15th, permitted (if it did not compel) the conclusion that a concerted and unlawful "wildcat" work stoppage had taken place, which was also a complete misuse of art. XIV of the collective bargaining agreement. See note 6, *supra*.

[12] Recent cases (one decided after the Superior Court had reversed the Commission's 1979 decision, and the other decided only a month earlier) show that, faced with an illegal work stoppage, the Committee reasonably could meet the stoppage by "self-help" without awaiting any Commission determination under G. L. c. 150E, § 9A. Such prompt action may be the most suitable way to prevent "the disruption of any essential public service, including public education." *Lenox Educ. Assn.* v. *Labor Relations Commn.*, 393 Mass. 276, 285 (1984), adhering to an earlier interpretation of § 9A in *Utility Workers, Local 466* v. *Labor Relations Commn.*, 389 Mass. 500, 503-505 (1983).

[13] This controversy now has continued for over six years with considerable inconvenience and expense to public bodies, to the courts, and to the parties. The 1979 decision of the Commission would have terminated the controversy then in a manner that must have seemed reasonable to the 1979 Commission. That Commission's order should have been sustained. A new remand to the Commission now would only prolong unnecessarily a controversy which should have ended in 1979.

[14] The decision that we now reach makes it unnecessary to consider arguments about the failure of the Committee's counsel to offer new evidence concerning the events of February, 1979. We note only that the one argument then advanced was without merit.